# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH *vs.* ANTHONY ROBINSON.

Suffolk. March 9, 2007. - April 26, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Evidence,* Expert opinion, Judicial discretion, Scientific test, Admissions and confessions. *Practice, Criminal,* Instructions to jury, Voluntariness of confession, Deliberation of jury, Jury and jurors, Capital case.

At a murder trial, the judge properly excluded the testimony of a defense witness who was offered as an expert regarding the psychology of interrogations and confessions, where the testimony fell far short of the standards governing the admissibility of scientific testimony. [4-7]

The judge at a murder trial did not err in responding to a jury question regarding coerced confessions, where she gave the humane practice instruction and added a dictionary definition of coercion that was sufficient and not overly narrow. [7-8]

At the trial of an indictment for murder in the first degree, the judge acted within her discretion in dismissing a deliberating juror who refused to return to court, where the judge conducted an adequate inquiry whether a strong

likelihood of unreasonable delay existed, the juror had actually created an unreasonable delay, and there was no showing of prejudice to the defendant sufficient to set aside the verdict. [8-11]

This court, having affirmed a conviction of murder in the first degree on a felony-murder theory with armed robbery as the predicate felony, vacated the defendant's underlying conviction of armed robbery. [11]

INDICTMENTS found and returned in the Superior Court Department on December 28, 1995, and February 12, 1996.

The cases were tried before *Sandra L. Hamlin,* J., and a motion for a new trial, filed on February 17, 2004, was heard by her.

*Charles K. Stephenson* for the defendant.

*John P. Zanini,* Assistant District Attorney, for the Commonwealth.

COWIN, J. In 1997, the defendant was convicted of murder in the first degree on a theory of felony-murder with armed robbery as the predicate felony. He was also convicted on four indictments charging armed robbery and one charging unlawful possession of a firearm.[1] The defendant appeals from his convictions and from the trial judge's denial of his motion for a new trial. His appeal consists of the following arguments: (1) the judge abused her discretion by excluding the testimony of a defense expert witness regarding the psychology of interrogations and confessions; (2) the judge erred in responding to a jury question concerning coerced confessions; (3) the judge improperly dismissed a deliberating juror who refused to return to court; (4) the conviction of armed robbery of the murder victim, Barrington Nevins, should be vacated if the conviction of murder in the first degree on the theory of felony-murder is affirmed; and (5) if the judgments are not reversed, that we exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree.[2] We affirm the convictions, and except for the conviction of armed robbery

---

[1]Although the defendant was also charged in four indictments with armed assault with intent to murder, the judge entered a required finding of not guilty on three of those charges and the jury acquitted the defendant of the fourth.

[2]The defendant's motion for a new trial did not raise any additional claims.

of Barrington Nevins, which we vacate, we decline to exercise our power under G. L. c. 278, § 33E. We also affirm the order denying the motion for a new trial.

*Facts.* As general background, we outline the facts that the jury could have found, and leave recitation of other facts for discussion in conjunction with the issues raised. On November 24, 1995, three men, one of whom was later identified as the defendant, approached the victim, Barrington Nevins, and five of his friends who were standing on a sidewalk in the Dorchester section of Boston. The defendant was carrying a rifle and another of the assailants had a handgun. The armed men demanded that Nevins and his friends turn over their leather jackets. One of the assailants held the handgun to the head of one victim. Despite the fact that the victims surrendered their jackets and pocket money, the defendant shot Nevins in the chest, killing him, and then pointed the rifle at another victim. As the robbers fired their weapons, the five surviving victims fled, but returned to the scene a short time later.

Three of the victims recognized the robbers. Two of them identified the defendant from a photographic array at the police station on the night of the incident. At trial, three of the victims identified the defendant as the killer. They all knew him by his nickname, "Ant." The three also identified the other two assailants by nickname.[3] The defendant, who was seventeen years of age at the time, fled after the murder and was arrested less than one month later in Petersburg, Virginia. While in custody, he was interviewed by Detective Sergeant Patrick Kelleher of the Petersburg, Virginia, police department, and confessed to his role in the robbery and murder. His confession was tape recorded. The interview lasted approximately forty-five minutes, including a recorded seven-minute portion.[4]

The defendant testified that he was selling cocaine on the street the night of the murder, several blocks from the area where the shooting occurred. Hearing gunshots, he left the

---

[3]The fourth victim testified regarding the incident at trial but did not recognize any of the assailants. The fifth victim died before the trial as the result of an unrelated shooting.

[4]A motion to suppress the confession was heard and denied. No issue is raised concerning the motion.

corner where he was selling drugs. When he learned that he was wanted for murder, he was frightened and went to Virginia to see his grandmother. He then turned himself in to the Virginia police.[5]

Concerning his interview with Detective Kelleher, the defendant stated the following at trial. The detective interviewed him at a juvenile detention facility,[6] informed him that two eyewitnesses, as well as one of the other assailants, had identified him as the shooter. The defendant said that the detective told him that the only way to avoid a life sentence was to confess to the shooting. He claimed that the detective related information about two recent cases, one in which a man who had killed someone did not speak to the police and received a life sentence; in the second, the "man admitted to shooting a person by accident and everything worked out for him and his friends." The defendant said that he ultimately confessed believing, "I wouldn't spend the rest of my life in jail. Things would work out for me like the person in the . . . story." He said that the detective provided him with the details of the crime, that the recorded confession was false, and that he did not shoot the victim. On cross-examination, the defendant admitted that he knew four of the robbery victims, including Nevins, the man who was killed. He also said that when he spoke with Detective Kelleher he knew that he was wanted for murder and that he had been advised of his Miranda rights before he gave the recorded confession.

*Expert testimony.* A hearing was held before the judge to consider the admissibility of the testimony of Professor Saul Kassin. The professor was offered by the defendant as an expert witness on the subject of the psychology of police interrogations and confessions. The judge refused to admit his testimony

---

[5]The defendant's aunt also testified as a defense witness and confirmed that the defendant had traveled to Virginia to see his grandmother.

[6]Apparently, an administrator at the juvenile detention facility informed Detective Kelleher that the consent of a parent or guardian of the defendant was necessary before the detective could interview the defendant. The detective obtained such permission from the aunt. From the view of Massachusetts law, this was an excessive precaution. We do not require such consent for an interview of a juvenile who is seventeen years of age. See *Commonwealth* v. *Considine*, 448 Mass. 295, 297 n.7 (2007); *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 855 n.12 (2000).

because it did not meet the "general acceptance" or "reliability" criteria required by *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25 (1994), and also because it concerned issues within the knowledge and experience of laypersons. The defendant claims that this was error that undermined his ability to "present an effective defense on the critical issue of the reliability of his confession, [thereby] violating his constitutional rights to due process."

A judge has broad discretion regarding the admission of expert testimony, and we review that decision only for abuse of discretion. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 833-834 (2004). In *Commonwealth* v. *Lanigan, supra,* we set forth the requirements for the admission of expert scientific evidence. A party seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community or by showing that the evidence is reliable or valid through an alternate means. *Canavan's Case,* 432 Mass. 304, 310 (2000).

We summarize the findings of the judge that were warranted on the evidence presented, supplemented by uncontested testimony from the motion hearing. Professor Kassin is a professor of psychology at Williams College who has authored books and articles concerning police interrogation and confessions, an area, according to him, of recognized scholarly study. He has conducted controlled experiments testing his theories[7] and had previously testified in other jurisdictions as an expert on interrogation and confessions. His fellow "experts" were unanimous that false confessions occur, and in his opinion, certain traditional methods of police interrogation increase the likelihood of a false confession. For example, according to Professor Kassin, threats, promises, and moral issues may have an impact on a suspect's thought process, including his consideration of the costs and benefits of cooperation. Although he admittedly

---

[7]The only significant experiment described by Professor Kassin apparently involved confronting student typists with a witness who claimed to have seen the students touch a key they had been instructed not to touch. The students consistently denied hitting the key until they were confronted by the witness. After that, sixty-nine per cent of them admitted touching the key. There was no testimony that the typists knew that, in fact, they had not touched the key during the experiment. Professor Kassin also acknowledged that this was not the same as people "confessing to a crime with severe, long-term consequences."

had not tested the defendant in the present case and could not assess his vulnerability to pressure, the professor opined that the techniques used by Detective Kelleher were psychologically "powerful" and had the potential of eliciting false confessions from innocent suspects. He also stated that his research indicates that jurors are not well equipped to assess the interaction between interrogation methods and confessions.

Nevertheless, on cross-examination the professor conceded that there was no empirical data on the number of false confessions, and that there is no scientific basis for distinguishing true from false confessions. Indeed, he admitted that one of his articles stated, "Further research in the field is sorely needed. . . . [T]he current empirical foundation may be too meager to support recommendations for reform or qualify as a subject of scientific knowledge." The professor also said that, in fact, in mock jury experiments, jurors were able to distinguish accurately voluntary from involuntary confessions. He agreed that he could not say that lay people could not accurately assess the techniques that would cause false confessions.

The judge concluded that Kassin's testimony did not meet the requirements set forth in the *Lanigan* case. We agree. As the judge stated, Kassin conceded that his opinions are not generally accepted, require further testing, and are not yet a subject of "scientific knowledge." One of his own publications admitted as much. Accordingly, his proposed testimony that certain interrogation techniques have previously produced false confessions does not meet either the general acceptance or reliability criteria established by the *Lanigan* case. The judge did not abuse her discretion in refusing to admit Professor Kassin's testimony.[8]

That said, the subject of psychological manipulation of a defendant and its relation to false confessions presents a serious issue. Competent scientific evidence that satisfies the *Lanigan*

---

[8]The judge also decided that the proffered expert testimony would not aid the jury in determining the credibility of the defendant's confession. Although she is correct that the credibility of witnesses is for the jury to determine and is not a proper subject for expert opinion, see *Commonwealth v. Ianello*, 401 Mass. 197, 202 (1987), the expert here was not opining on the truth of the defendant's confession, but on whether the police tactic was likely to induce a false confession.

standard may well be useful to a fact finder in this area, but the evidence here fell far short of the standards governing the admissibility of scientific testimony. The testimony failed the *Lanigan* criteria in every respect and was properly excluded.

*Jury question.* The judge charged the jury in accordance with our humane practice, see *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-150, cert. denied, 457 U.S. 1137 (1982), that inter alia, the burden is on the Commonwealth to prove that the defendant's will was not overcome and that he was not coerced, tricked, or cajoled into making a statement. See *Commonwealth* v. *Jackson*, 447 Mass. 603, 610 (2006). During deliberations, the jury sent a note to the judge with several questions, including: "As we understood the instruction on the confession, if the confession was coerced it must be disregarded. Is this correct? What is coercion? Can something be coerced and true?"

Defense counsel requested that the jury be instructed that they could consider other factors, such as whether the defendant was influenced by threats or promises of leniency, and the defendant's age, educational background and emotional stability.[9] The judge refused to give the defendant's instruction and instead repeated the initial humane practice instruction, which spanned several pages, and added the following dictionary definition of coercion: "to bring about by force or threats to nullify individual will."[10] The defendant objected to the instruction.

The defendant claims that the judge erred by not listing the specific factors the jury should consider when deciding whether his statement was voluntary. "The proper response to a

_____

[9]The defendant requested the following additional instruction: "You may consider whether the defendant, in making the statement, was influenced by any threat or promise of leniency or by trickery or by deceit or by improper inducement by law enforcement officers. You may also consider the conduct of the defendant, the defendant's age and educational background, his intelligence and emotional stability and the details of the interrogation."

[10]The judge's additional instruction charged: "The Commonwealth must prove that the defendant was not coerced, tricked, or cajoled into making the statement. You have asked me what is coercion. I asked one of the law clerks to look it up in the dictionary, in Webster's Dictionary. Basically, what it means is to bring about by force or threats to nullify individual will. So, in other words, you must find that the Commonwealth has proven that the defendant's statement was voluntary, not involuntary. It must be a voluntary statement, a product of the defendant's free will and rational intellect, not coerced, tricked, or cajoled, before you may consider it."

jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly." *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997), quoting *Commonwealth* v. *Waite*, 422 Mass. 792, 807 n.11 (1996). There was no abuse of discretion.

A judge need not use any particular words in instructing the jury as long as the legal concepts are properly described. *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995). The instruction given was correct and responded to the question. The question suggested juror confusion regarding the effect of a coerced confession. To that inquiry, the judge responded, "The Commonwealth must prove that the defendant was not coerced, tricked, or cajoled into making the statement." In addition, she said, "It must be a voluntary statement, a product of the defendant's free will and rational intellect, not coerced, tricked, or cajoled, before you may consider it." The issue the jury were concerned about was coercion and the judge responded sufficiently. The over-all effect of her statements communicated to the jury the instruction that was required — specifically, that they could not consider a coerced confession. The only question remaining is whether her definition of coercion was too narrow. She provided a dictionary definition of coercion: "to bring about by force or threats to nullify individual will." We conclude that this definition was sufficient.[11]

*Discharge of deliberating juror.* The defendant contends that the judge erred by dismissing a deliberating juror without bringing her to court for a hearing or considering other options. The jury began deliberations on the afternoon of October 7, 1997, and deliberated that day and the following day. On the third day of deliberations, one juror did not appear at the appointed time

[11]Responding to a jury inquiry by repeating the instruction that relates to the question is a tempting practice. But the jury submit the question with knowledge of the original instruction. Submission of the question indicates that after considering the evidence in light of the instruction, the jury need more assistance. Additional guidance is provided by a direct answer to the question presented. For example, in the situation here, an answer might be in the following terms: "Yes, a coerced confession must be disregarded whether true or not. Coercion is the use of force or intimidation to obtain compliance. Yes, a statement may be both coerced and true."

of 9 A.M. A court officer telephoned that juror, who responded that she had no one to care for her children because "their girl is sick." The juror indicated that she was trying to find another care giver and would call back in five minutes. The judge advised the parties sometime thereafter that the "[care giver] who was previously ill is feeling a little better now and is able to take over for her," but that the juror had added gratuitously, "I want you to know I'm not happy about having to come in." When the juror did not appear, the court officer called her again shortly before 11 A.M. and was told that "[the care giver] is too sick to come and she [the juror] is not coming [to court]."

When the judge indicated that she was contemplating replacing the juror and instructing the jury to begin deliberations anew, the defendant objected and requested the judge to consider other options, such as ordering the juror to appear and inquiring of her why she was ignoring "her oath." The judge noted that the juror had been consistently late during the two-week trial, was refusing to return to court (with a "transparent excuse"), and was causing unreasonable delay (it was now 11:20 A.M.). The judge then discharged the woman, replaced her with an alternate juror, and instructed the jury to begin deliberating anew. The jury asked one question later that day, and the question was answered the following morning. The jury returned their verdicts at 11 A.M. on the morning after the juror was replaced.

The replacement of a juror who does not appear for deliberations is governed by G. L. c. 234A, § 39, which provides in relevant part:

> "The court shall have the discretionary authority to dismiss a juror at any time in the best interests of justice. The court shall have authority to excuse and discharge an impanelled juror prior to jury deliberations after a hearing upon a finding of extreme hardship. The court shall have authority to excuse and discharge a juror participating in jury deliberations after a hearing only upon a finding of an emergency or other compelling reason. The court shall have authority to dismiss an impanelled juror who has not appeared for juror service upon a finding that there is a strong likelihood that an unreasonable delay in the trial

would occur if the court were to await the appearance of the juror."

Section 74 of the same chapter provides that no irregularity in discharging a juror shall be sufficient cause to set aside a verdict unless the objecting party has been prejudiced thereby.

The last sentence of the quoted portion of § 39 grants a judge discretion in the case of an absent juror. The penultimate sentence by its terms requires a hearing, but that sentence assumes the availability of the juror for the hearing. The last sentence applies to those cases, such as the present, in which a juror fails to appear. In that situation, the statute vests in the judge discretion to dismiss a juror on a finding that there is "a strong likelihood [of] unreasonable delay" from waiting for the juror. In such case, the judge "need only gather such information from available sources as is necessary . . . to determine, in [the judge's] discretion, whether there exists a 'strong likelihood' of an unreasonable delay in the trial caused by the absent juror." *Commonwealth* v. *Taylor*, 33 Mass. App. Ct. 655, 657 (1992). The judge is thus required to conduct an inquiry that satisfies her and enables her to arrive at a reasoned decision.

The judge here conducted an adequate inquiry. The defendant had the opportunity to state his position and did so. His suggestion of exploring other options was impractical. The recalcitrant juror had indicated that she would not leave her home. Arresting the juror and bringing her to court (an alternative considered and rejected by the judge) would have entailed bringing the juror's child or children with her. Providing alternative care for them would have consumed much time. Ultimately, the entire effort would be for naught. A juror concerned about her child's (or children's) welfare would be distracted and unable to concentrate on the evidence or deliberate fairly on the case, and the juror would eventually have had to be released after much additional delay. The defendant's other suggestion of inquiring of the other jurors whether the recalcitrant juror had refused to deliberate would have intruded into the deliberations of the jury. See *Commonwealth* v. *Kincaid*, 444 Mass. 381, 391 (2005), and cases cited ("A judge may not inquire into the deliberative process of the jury").

The judge clearly acted within her discretion in determining,

at 11:20 A.M., that the juror had created an unreasonable delay. The judge stated several times that she was concerned that the jury had been waiting since 9 A.M. The juror had never made any effort to contact the court; all communication with her was initiated by the court officer; after making excuses the juror had said she would not come in; it was to no one's advantage to force her to come in; and she had been "consistently late" throughout the trial.[12]

Furthermore, there was no showing of prejudice to the defendant sufficient to set aside the verdict. See G. L. c. 234A, § 74. The alternate was a juror whom the defendant had agreed could be seated, and the alternate had heard all the evidence. Finally, the judge carefully instructed the newly constituted jury to begin their deliberations anew.[13]

*Armed robbery conviction.* Because we affirm the conviction of murder in the first degree on a felony-murder theory with armed robbery as the predicate felony, the underlying conviction of armed robbery of Barrington Nevins is to be vacated. *Commonwealth* v. *Gunter*, 427 Mass. 259, 276 (1998). The Commonwealth concedes as much.

*Relief pursuant to G. L. c. 278, § 33E.* After a careful review of the record, we find no reason to exercise our extraordinary power under G. L. c. 278, § 33E. Accordingly, the case is remanded to the Superior Court. The judgment and sentence on the conviction of armed robbery of Barrington Nevins is to be vacated. The remaining judgments of convictions are affirmed. The order denying the motion for a new trial is affirmed.

*So ordered.*

---

[12]Other possibilities were available to the judge that would not have entailed a great deal more time. The judge could have had a telephone conference call with the juror in the presence of the defendant, counsel, and the prosecutor. Although proceeding in such manner would have been preferable, the judge did not abuse her discretion in not doing so.

[13]The defendant raises a due process argument regarding discharge of the juror. However, the due process clause is flexible, and no specific type of hearing is mandated in all situations. See *Roe* v. *Attorney Gen.*, 434 Mass. 418, 427 (2001). The hearing was sufficient to satisfy due process.