## COMMONWEALTH *vs.* ADAM SANDERS.

Plymouth. March 7, 2008. - April 30, 2008.

Present: GREANEY, IRELAND, COWIN, CORDY, & BOTSFORD, JJ.

*Homicide. Practice, Criminal,* Issuance of process. *Habeas Corpus. Practice, Criminal,* Discovery, Comment by prosecutor, Instructions to jury, Jury and jurors, Polling of jury, Assistance of counsel.

A Superior Court judge properly exercised her discretion in denying the criminal defendant's pretrial motion for a writ of habeas corpus for a witness serving a Federal sentence in an out-of-State facility, where the witness's attorney asserted that the witness would claim his privilege under the Fifth Amendment to the United States Constitution if called to testify, and where the Commonwealth left no question that it would not immunize the witness. [294-296]

There was no merit to a criminal defendant's contention that he was improperly deprived of discovery materials containing certain telephone numbers provided to police by a witness, where there was no evidence that a written list of such telephone numbers existed; where the defendant never requested that the telephone numbers be turned over; and where he never sought a continuance to obtain the information or attempted to call the police officer who received the numbers to testify (nor was there evidence that there was a report by that officer as to the numbers). [296]

In his closing argument at a criminal trial, the prosecutor did not improperly vouch for the credibility of three prosecution witnesses, where none of the challenged statements suggested that the prosecutor had information beyond that contained in the record, and where the defendant did not provide adequate supporting argument for his assertion that the statements constituted vouching. [296-298]

At the trial of indictments charging, inter alia, murder in the first degree, the prosecutor did not misstate the testimony of three witnesses, where, as to the first witness, the medical examiner, the prosecutor's improper statement (though not a misstatement of the evidence) could not have swayed the verdict, and the judge interrupted and cautioned the prosecutor not to misstate the testimony, essentially striking the prosecutor's remark and taking powerful action to avoid any prejudice; where, as to the second witness, the discrepancy between the prosecutor's version and the witness's actual testimony did not appear to be material, and the judge forcefully corrected the prosecutor and provided proper guidance; and where, as to the third witness, the defendant did not demonstrate that he was prejudiced by the discrepancy in the prosecutor's statement regarding that witness's testimony, and the judge's instructions prevented the statement from improperly affecting the jury. [298-300]

At a murder trial, the judge's instructions to the jury regarding their ability to consider the Commonwealth's failure to conduct certain tests adequately conveyed the essence of the instruction, and it was not necessary for the judge to give the exact words of the instruction requested by the defense. [300]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the judge's instructing the jury regarding self-defense when no evidence of self-defense was presented, where the statement actually provided the defendant an additional possibility for acquittal, and where the immediately following reiteration of the Commonwealth's burden precluded improper burden-shifting. [300-301]

A criminal defendant's complaint that the judge failed to give an instruction on the possibility of an honest but mistaken identification by a witness was unavailing where the defendant failed to request such an instruction. [301]

There was no merit to a criminal defendant's contention that the trial judge should have made a preliminary determination that a particular witness had "adopted" her grand jury testimony before permitting the jurors to consider that testimony, and that the judge did not provide adequate instruction regarding what it means to "adopt" prior testimony, where no authority required the judge to make such a preliminary determination; where there was no error in failing to provide a definition of "adopting" prior testimony; and where, even if there were error, the subject matter involved was not important to the outcome of the case. [301-303]

At a criminal trial, the judge did not abuse her discretion in releasing two deliberating jurors who had informed the judge of previously scheduled airline travel for certain dates that the trial ultimately exceeded and regarding which the judge assured the jurors they would be excused if in conflict with their service, where the judge made the promise to the jurors with no objection by the defendant; where one of the jurors had nonrefundable vacation tickets, and the other had to travel for business; where there was no indication that the replacement of one of the jurors swayed the impasse the jurors had reached in favor of conviction; where the alternates selected were jurors whom the defendant had agreed could be seated and who heard all the evidence; and where the judge carefully instructed the newly constituted jury to begin their deliberations anew; however, this court recommended that judges not seat jurors who have travel plans that may conflict with the completion of the trial. [303-307]

At a murder trial, there was no error in the judge's perfectly clear instruction informing the jury that they must reach a unanimous verdict as to each theory of liability. [307-308]

At a murder trial, the judge did not abuse her discretion in polling the jury generally on the murder verdict rather than on each of the theories of murder on which they found guilt, where the defendant did not make such a request at trial and where there was no such requirement. [308]

A criminal defendant claiming ineffective assistance of trial counsel failed to develop the record on such claims, to explain how he was prejudiced by any such inadequacies, or to indicate any unreasonable tactical decision on the part of his counsel. [308-309]

INDICTMENTS found and returned in the Superior Court Department on November 13, 2000.

A pretrial motion to compel a grant of immunity was heard by *Nonnie S. Burnes*, J.; the cases were tried before *Geraldine S. Hines*, J.; and a motion for new trial, filed on September 13, 2004, was heard by *Charles M. Grabau*, J.

*Michael P. Doolin* for the defendant.

*Catherine L. Semel*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted of murder in the first degree on theories of premeditation and extreme atrocity or cruelty. He was also convicted of unlawful possession of a firearm. Appealing from the convictions and from the denial of his motion for a new trial, the defendant argues that (1) the motion judge's denial of his pretrial requests to produce a witness serving a Federal sentence in an out-of-State facility deprived him of exculpatory evidence; (2) he was improperly deprived of discovery materials containing telephone numbers provided to police by a witness; (3) in his closing argument the prosecutor vouched for the credibility of Commonwealth witnesses and misstated the evidence; (4) the judge's instructions to the jury were erroneous; (5) the judge improperly released two deliberating jurors; (6) the judge did not poll the jurors correctly; and (7) the defendant's trial counsel was ineffective. Finally, the defendant asks that, if the judgments are not reversed, we exercise our extraordinary power under G. L. c. 278, § 33E, to grant a new trial or reduce the verdict of murder in the first degree to murder in the second degree. We affirm the convictions and the order denying the motion for a new trial, and we decline to exercise our power under G. L. c. 278, § 33E.

*Facts.* We recite the facts the jury could have found, reserving further details for discussion in conjunction with the specific issues raised. In the early hours of June 5, 1999, Brockton police found the victim Robert Wise (nicknamed "Quick"), lying on the ground of the parking lot of Slade's, an "after hours" club (a club that operates after the bars close). Several of the victim's friends were screaming around him and other people were also in the area. The twenty-four year old victim, after having been shot five times, died later that morning.

Prior to the shooting, the victim had been out with his friend, Darrell Coakley, and two women, Tonika Wilks and Tomauren Tillman. At about 2 A.M., as the four people were leaving Timeout, a Brockton nightclub, a man approached Tillman in the parking lot and grabbed her arm. The victim confronted the man, who was accompanied by two other males. The confrontation escalated before the man and his two companions left. Although no one at trial identified the men involved in this encounter, the jury could have credited evidence that Tyson Silva was the man who grabbed Tillman's arm and that one of the men with him was the defendant. Apparently, this confrontation provided the motive for the murder.

The victim and his three friends went from the Timeout to Slade's, also in Brockton. There the victim was standing on the sidewalk when he was shot by the defendant. Two witnesses, Rotunda Harper (nicknamed "Kissy"), and Tyson Silva, both of whom had known the defendant for several years, saw the defendant take out a gun and shoot the victim. Although unable to identify the shooter, the victim's friend, Coakley, saw a man whom he recognized as one of the people in the earlier encounter raise "something" from his waist and aim it toward the victim's back. Coakley then heard four or five sounds like firecrackers, and saw the victim fall to the ground as the shooter ran away.

Additional testimony supported the identification of the defendant as the shooter. According to Bobby Brantley, an old friend of the defendant, and an immunized witness, the defendant contacted him sometime later on the day of the shooting to request that Brantley sell a gun for him. The defendant had previously shown Brantley this .380 caliber semiautomatic weapon. After Brantley arranged to sell the gun to Antwone Bogus, he and the defendant made the sale. The defendant told Brantley that the gun was "dirty," that is, it "ha[d] a murder on it," and that he, the defendant, had killed someone named "Quick" at "Slade's after party." The defendant also said that he "shot him the first shot and the dude 'Quick' fell to the ground and he was standing over him and emptied on him," that is, he "shot all the bullets out of the gun." The defendant stated that Silva had been arguing with "Quick" about a girl.

The police obtained the above information from Brantley

seven months after the murder when Brantley was arrested on various State charges and was anxious to avoid incarceration. (Brantley faced the possibility of Federal charges as well.) To corroborate his statement, Brantley agreed to help the police recover the murder weapon that he had arranged to sell for the defendant. Brantley made some telephone calls, contacting Bogus and others, and eventually arranged for the gun to be "bought back" from one "Jimmy Chin." According to a ballistics analysis, this weapon was the source of four of the five shell casings[1] recovered from the murder scene and the five bullets recovered from the victim's body.

The defense theory was that the Commonwealth's witnesses could not be believed; each was highly motivated to testify as the government wished. According to the defendant, the likely scenario was that Silva killed the victim. It was Silva who first approached Tillman; he had a "previous history" with the defendant[2]; and he was admittedly present at the scene of the shooting.

1. *Denial of request for process for out-of-State witness.* The defendant claims that the motion judge (who was not the trial judge) improperly denied his pretrial motion for a writ of habeas corpus to produce Leonard Baskin, who was incarcerated in Texas. According to the defendant, Baskin would testify that he saw an individual other than the defendant shoot and kill the victim, and that, after the shooting, Baskin paid that person $10,000. The money was allegedly paid on behalf of two drug dealers for whom Baskin worked.

After a nonevidentiary hearing and a telephone conference call with Baskin's attorney, the judge denied the motion. She did so based on the attorney's representation that Baskin would claim his privilege under the Fifth Amendment to the United States Constitution if called to testify, and that Baskin would not testify unless granted immunity. The same representations are also contained in a letter appended to pretrial papers, and in the attorney's affidavit. The judge was also aware that the Commonwealth would not grant Baskins immunity. The defendant objected, maintaining that the judge should not determine whether the assertion

---

[1]One of the five casings was only a fragment and too small for comparison.

[2]The "previous history" is not defined in the record beyond the fact that the victim and Silva had served time together.

of the privilege was valid until a hearing was held and Baskin appeared to assert the privilege.

"The right of a witness not to incriminate himself is secured by both the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights." *Taylor v. Commonwealth*, 369 Mass. 183, 187 (1975). We apply broad standards that are "highly protective" of the constitutionally guaranteed right against self-incrimination so that one who claims the privilege may not be compelled to testify "unless it is '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate" (emphasis in original). *Commonwealth v. Martin*, 423 Mass. 496, 502 (1996), quoting *Commonwealth v. Funches*, 379 Mass. 283, 289 (1979). It is within the discretion of the judge whether to compel the production of a potential witness. *Commonwealth v. Drew*, 397 Mass. 65, 70 (1986), *S.C.*, 447 Mass. 635 (2006), cert. denied, 127 S. Ct. 2269 (2007).

The judge properly exercised her discretion in accepting the attorney's assertion of the claim of privilege and in denying the motion for a writ of habeas corpus. The papers filed by the defendant and the representations of Baskin's attorney established a factual basis for assertion of the privilege: Baskin's anticipated testimony was that he had been a conduit in paying someone to commit murder. Whether a grant of immunity should be extended is a matter reserved to the Commonwealth, see G. L. c. 233, § 20E, and the Commonwealth left no question that it would not immunize Baskin.

The defendant contends that, pursuant to *Commonwealth v. Martin*, *supra* at 502-505, the judge was obligated to conduct a hearing before determining that the privilege was validly asserted. The defendant misreads the *Martin* decision. That case stands simply for the proposition that, if there is a question about the propriety of the privilege claim and insufficient information for the judge to make a ruling, an in camera hearing may be conducted. That is, where "the information available to the judge does not, in the judge's estimation, afford adequate verification of the witness's assertion of the privilege," the judge "has the authority" to conduct an in camera hearing. *Id.* at 504. There is no

requirement that the judge do so, and the judge here properly believed that she possessed sufficient information to make the ruling.

2. *Discovery of telephone numbers.* The immunized witness, Bobby Brantley, testified that, after his arrest, he gave to Sergeant Robert Harrington of the Boston police department the telephone numbers Brantley called in order to locate the gun that he had helped the defendant sell. The defendant makes two complaints in this regard, first, that the Commonwealth did not provide him this "list" of telephone numbers and second, that he was not given Harrington's report containing such numbers. As to the telephone numbers, although a list may well be a sufficiently formal presentation of information to qualify as a "statement" for purposes of Mass. R. Crim. P. 14 (a) (2), 378 Mass. 874 (1979), see *Commonwealth* v. *McGann*, 20 Mass. App. Ct. 59, 65 (1985), Brantley testified that he did not give the police a written list of the numbers that he called: "It wasn't a list. I just said it." There is no evidence that "a list" existed; indeed, the evidence is to the contrary. In addition, the defendant never requested that the telephone numbers be turned over, nor did he seek a continuance to obtain the information or attempt to call Harrington as a witness.

Regarding the second matter, a report by Harrington, there is no evidence in the record that such a report existed. When the issue arose, the prosecutor indicated that he was not aware of any such report. The judge requested that "inquiry" be made, and there is no further reference to the matter in the record.

3. *Closing argument.* The defendant claims that the prosecutor argued improperly by "vouching" for the credibility of three prosecution witnesses: Rotunda Harper, State Trooper Elizabeth Clifford, and Darrell Coakley. He maintains also that the prosecutor misstated the testimony of three witnesses: Dr. Richard Evans, Darrell Coakley, and Bobby Brantley. We consider each of his contentions in turn.

There was no objection to the alleged instances of vouching; thus, we review to determine whether the statements were improper, and, if so, whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Guy*, 441 Mass. 96, 109 (2004). A prosecutor may not express his personal

belief in the testimony or suggest that he has knowledge independent of the evidence at trial. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998); *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993). Nor may the prosecutor suggest that he has personal knowledge of, or vouch for, the credibility of a witness. *Commonwealth* v. *Marrero*, 436 Mass. 488, 501-502 (2002). However, the prosecutor may comment on and draw inferences from the evidence at trial, see *Commonwealth* v. *Chavis*, *supra*, and cases cited, or state logical reasons why a witness's testimony should be believed, *Commonwealth* v. *Rolon*, 438 Mass. 808, 816 (2003).

The defendant cites four passages in which he claims the prosecutor vouched for Harper's credibility. Because defense counsel had placed Harper's credibility at issue both during his cross-examination of her and in his closing argument, the prosecutor was entitled to respond within the limits of the evidence and to provide the jury with reasons for believing Harper. See *Commonwealth* v. *Chavis*, *supra* at 714. We have examined the statements and we find nothing that implied that the prosecutor had information outside the record. He did not ally himself or the power of his office behind the credibility of the witness or suggest that he had extra-record information that Harper's testimony was worthy of belief. See *Commonwealth* v. *Smith*, 387 Mass. 900, 906-907 (1989). The defendant has provided only his assertion that the statements constitute vouching without adequate supporting argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

The prosecutor said that Trooper Clifford (who worked in the State police forensics section) "was absolutely honest when she said, 'I can only tell you where [the shell casings] were at 4:30 or so in the morning [i.e., when she arrived at the scene].' " Trooper Clifford's statement meant that she could not identify where the casings were before she located them. The prosecutor's characterization of Clifford's testimony as "absolutely honest" was intended as argument that this witness did not seek to provide more information than what she actually knew. His assertion was that this witness was credible because she limited her testimony to that which was within the scope of her responsibility and her ability, a proposition that does not constitute vouching. See *Commonwealth* v. *Koumaris*, 440 Mass. 405, 414-415 (2003).

While discussing Darrell Coakley's participation in a photographic array, the prosecutor said that Coakley's attorney "was there to make sure the rules were followed, wasn't he? What were you being told? . . . [I]t goes both ways. If the lawyer is there to somehow keep the police hones[t] in what they do in that photo array, then the lawyer is there to keep the conversation and information given by Darrell Coakley honest." The remark appears to have no basis in the evidence or in logic, but it does not suggest that the prosecutor had information beyond that contained in the record.[3] *Commonwealth* v. *Smith, supra.*

The defendant maintains that the prosecutor misstated the trial testimony in three instances. The defendant objected at trial to each of these statements. We review to determine whether the statements were improper and, if so, whether they "did not influence the jury, or had but very slight effect, [i.e., whether we can say] with fair assurance, after pondering all that happened without stripping the [improper] action from the whole, that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445 (1983).

The prosecutor stated in regard to the medical examiner, Dr. Richard Evans: "[A]ll you have to think of is Dr. Evans describing how somebody stood over and fired [*sic*] times into a body." The defendant objected at that point. The prosecutor did misstate the evidence. The improper statement, however, could not have swayed the verdict. There was evidence that the victim was shot five times, and Bobby Brantley testified that the defendant had said he fired one shot, causing the victim to fall, and that he then fired the remaining bullets in his gun. This was corroborated by the testimony of other witnesses, who stated that the victim was shot and fell to the ground, and by police testimony that the victim was found lying on his back. An additional factor is that when the defendant objected to the prosecutor's statement, the judge interrupted and cautioned the prosecutor not to misstate the testimony. This, in effect, struck the prosecutor's remark and was powerful action to avoid any prejudice.

---

[3]Even if the statement were improper, it could not be considered harmful to the defendant: Coakley selected someone other than the defendant from the photographic array.

In regard to Darrell Coakley, a prosecution witness, the prosecutor stated: "What does he tell you happens at Montello Street [the location of the shooting]? The first time he's asked, the day of the crime, he's not talking. They manage to arrest him that night. He's not talking. Now you bring him back to March 30 —" There was an objection at this point. Although the defendant does not identify the impropriety in this statement, we assume it is that Coakley in fact testified that he did not recall the police asking him on the morning of the shooting what he had seen, while the prosecutor characterized the exchange as one in which Coakley refused to answer. The discrepancy between the prosecutor's version and Coakley's actual testimony does not appear to be material, and the defendant suggests no reason why it is.[4]

In addition, when defense counsel objected, the judge reprimanded the prosecutor: "[T]his is the second time I'm going to caution you against misstating the evidence. . . . This argument is not evidence."[5] The judge forcefully corrected the prosecutor and provided proper guidance. The misstatement could not have swayed the jury.

The final portion of the argument in which the defendant alleges that there was a misstatement concerns Bobby Brantley. The prosecutor stated: "And they talk about federal prison and felon in possession. Well, from July 4th (the date on which Brantley allegedly shot someone at Franklin Field) when he gets grabbed in Boston, allegedly with a gun, up until the day he is arrested in Newton at the end of January, the only charges Suffolk brought —" The defendant objected that "grabbed"

---

[4]Furthermore, even if the misstatement were material, it is not harmful to the defendant. Coakley was a prosecution witness, and the misstatement that Coakley did not respond when initially asked by the police about the crime impeached his credibility to a greater extent than his testimony justified.

[5]The full text of the judge's instruction is as follows:

"Mr. Mitchell, this is the second time I'm going to caution you against misstating the evidence. I will instruct the jury that it's your memory of the evidence that counts. This argument is not evidence. You may continue."

We believe that the word "your" in the second sentence of the instruction is a stenographic error; the word should be "their." The correct wording of the same instruction appears in other places in the transcript.

was not an accurate statement of the evidence. Although the defendant is correct that Brantley was not "grabbed" on July 4 (he was not arrested until later), the police were seeking him at that time. We do not understand how the discrepancy affected the case against the defendant, and defense counsel has not so informed us. The issue may be the timing of the arrest; it may be the characterization by use of the word "grabbed." In either event, the defendant has not demonstrated that he was preju-diced. Furthermore, the judge again stated: "The jury is going to be instructed that it is their memory of the evidence that counts, not what [the prosecutor] tells you." She also instructed at the start and close of trial that the jurors are the arbiters of the facts and that counsel's arguments are not evidence.

4. *Jury instructions.* The defendant faults the judge's instruc-tions to the jury in four respects. First, he claims that the so-called *Bowden* instruction was incomplete. See *Commonwealth v. Bowden*, 379 Mass. 472, 485-486 & n.7 (1980) (jury may be instructed that they can consider inadequacies of police in-vestigation). Here, at the defendant's request, the judge gave such an instruction. However, the defendant contends that the instruction given was "inadequate and erroneous" because it failed to state that the jury could draw a negative inference from the Commonwealth's failure to perform certain tests or investigations. The defendant objected to the omission of such a sentence. The judge's instruction on the issue is reprinted in the margin.[6] The judge's words adequately conveyed the essence of the instruction, i.e., that the jury could consider police failure to conduct certain tests. It is not necessary to give the exact words of the instruction requested by the defense. See *Commonwealth v. Sherry*, 386 Mass. 682, 696 (1982).

The defendant next argues that the judge erred by instructing the jury that "the evidence in this case raised the issue of . . .

[6] The judge instructed: "In your evaluation of the evidence, you may also consider whether, in the circumstances of this case, it was reasonable for the Commonwealth to perform certain scientific tests or to follow certain police investigative procedures, and if so, whether those tests were performed and procedures followed. If you find that it would be expected in the normal course of events to perform such tests or to follow such investigative procedures and that the Commonwealth failed to do so, you may consider this in your determina-tion of the issue before you."

self-defense," when no evidence of self-defense was presented. The defendant is correct that the case raised no issue of self-defense. There was no objection to this misstatement. We review to determine whether the additional language created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Vinton*, 432 Mass. 180, 188 (2000). The erroneous statement occurred in the following instruction:

> "An unlawful killing is a killing done without excuse. Not all killings are unlawful. A killing may be excused, for example in the case of self-defense, defense of another, or in some cases an accident. The evidence in this case raised the issue of whether [*sic*] excused as a result of self-defense. Nonetheless, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant unlawfully killed the deceased."

The statement actually provided the defendant an additional possibility for acquittal, by suggesting that, if he were the shooter, the killing might have been excused by reason of self-defense. The improper sentence was immediately followed by a reiteration of the Commonwealth's burden; thus, there was no possibility of burden-shifting.

The defendant claims additionally that the judge is required to give an instruction on the possibility of an honest but mistaken identification by a witness when it is requested and when the evidence would warrant such an instruction. *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983). See *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 301-302 (1979). The defendant is correct, but he never requested such an instruction.

Finally, the defendant contends that the judge instructed the jury improperly in response to a jury inquiry about the correct use of Rotunda Harper's grand jury testimony. During cross-examination by the defense attorney, Harper was asked where she saw the defendant and his friends go after the shooting. Harper testified to where Silva went, but said that she did not recall where the others went. Defense counsel read her grand jury testimony to the effect that she saw the defendant and his two companions run down Packard Street. He culminated his reading of the grand jury testimony by asking: "That's what you said in the [g]rand [j]ury. And you and your friend left?" She responded:

"Yeah, we went to my house." There was no objection by the prosecutor to this testimony.

Later, during deliberations, the jury sent a note to the judge inquiring, inter alia, see part 5, *infra*, if they could have the "last five minutes" of Harper's testimony.[7] The jurors also asked whether the questions about Harper's grand jury testimony and the subsequent answers were to be considered evidence. The judge discussed the questions with counsel. Eventually, the judge formulated an answer that the references to Harper's grand jury testimony could be considered for substantive purposes only if the jurors found that Harper had "adopted" that earlier testimony. Both counsel were content with this instruction.[8] The judge decided to provide the jury with the entire transcript of Harper's trial testimony.[9] She instructed the jury as she had indicated she would, and there was no objection.

On appeal, the defendant argues that the judge should have made a preliminary determination that Harper had "adopted" her grand jury testimony before permitting the jurors to consider that testimony at all and that the judge did not provide adequate instruction regarding what it means to "adopt" prior testimony. The defendant cites no authority requiring the judge to make a preliminary determination that the witness adopted the grand jury testimony, and we are aware of none. As to any deficiency in the adoption instruction, the word "adopt" is a common one; the jury could understand it without additional instruction. There was no error in failing to provide a definition.[10]

In any event, the issue of the witness's adoption of her grand

[7]The jury had previously requested a transcript of all of Harper's testimony and were told by the judge that such could not be provided. Presumably, that denial was the reason for the truncated request. See note 12, *infra*.

[8]If the witness affirms the truth of the prior statement, the witness adopts it and there is no hearsay problem. See *Commonwealth* v. *Daye*, 393 Mass. 55, 67 n.13 (1984).

[9]The judge did not want to provide only one part of Harper's testimony, lest too much emphasis be placed on that part. The court reporter agreed to work overnight to reproduce all of Harper's testimony.

[10]We observe that Harper's response at trial that she "did not recall" where the other two men went after the shooting cannot be inconsistent with anything she said at the grand jury. A lack of memory is simply that; it is not a statement of anything, and cannot be impeached by a prior statement regarding what had occurred. *Commonwealth* v. *Martin*, 417 Mass. 187, 197 (1994) (prior statement of witness not admissible where witness had no present

jury testimony is not an important one. The substance of the testimony — where the men ran after the shooting — was not in any sense critical. Even if there were error, and we have found none, the subject matter involved was not important to the outcome of the case.

5. *Release of two deliberating jurors.* The defendant contends that the judge's discharge of juror no. 7 and juror no. 8 during deliberations was prejudicial error and deprived him of a fair and impartial jury under Federal and State law. During empanelment, on Wednesday, June 4, 2003, when the judge informed the venire of the estimated length of the trial (five days, with deliberations likely to begin on Wednesday, June 11), two members of the venire (later seated as juror no. 7 and juror no. 8) indicated that they had scheduled airline travel for the weekend of June 14-15. The judge assured each of the two at individual sidebar discussions that they should be able to serve "without any anxiety." She told juror no. 8 that if the case were not completed the juror would be "allowed" to leave for her trip, and that she should not "be concerned" about the trip. The judge made it clear to counsel that these two jurors "absolutely would have to be excused if for some reason this case is still going on next Friday." Neither counsel objected or suggested that the jurors in question not be seated.[11] Juror no. 7 was selected as foreperson pursuant to the judge's practice of selecting the juror in seat number seven as the foreperson.

Trial proceeded and deliberations began, as predicted, on Wednesday, June 11, with the participation of both juror no. 7 and juror no. 8. After deliberations had continued for about five hours (including lunch) on Wednesday and for almost two hours the

memory of substance of prior statement). See M.S. Brodin & M. Avery, Massachusetts Evidence § 6.13.2, at 318-319 (8th ed. 2007). Unless the judge makes a finding that the lack of memory is a pretext, the use of grand jury testimony is not implicated. See *Commonwealth* v. *Sineiro*, 432 Mass. 735, 745 n.12 (2000). Clearly, there was no basis for such a finding of pretext here, and none was made. Thus, the witness was never actually impeached with her grand jury testimony. Nevertheless, there was no objection by the prosecutor to this impropriety.

[11]The judge had intended to seat sixteen jurors, but when the venire was exhausted with only fifteen seated, the parties consented to proceed with that number. The number was reduced to fourteen when, following the view, one juror was dismissed at the defendant's request.

next morning, Thursday, June 12, the jurors sent the following inquiry to the judge: "We seem to be unable to come to a decision in this case. Do you have any suggestions to help us through this impasse?" The judge indicated to counsel that she would instruct the jury to proceed because they hadn't "been there long enough," and she informed them, without objection, that they should "continue . . . discussions and continue to listen to each other." Later that afternoon (Thursday), the jurors sent another note, again mentioning an "impasse," but also requesting the last five minutes of Rotunda Harper's testimony and inquiring about the proper consideration of that witness's grand jury testimony.[12] When the judge stated, "[T]hey're obviously not at an impasse if they're asking these questions," defense counsel did not suggest otherwise. After consultation with counsel, the judge responded to the jurors the following morning, Friday, June 13. She also provided the jury with the entire transcript of Harper's testimony. There was no reference to the "impasse" and no objection was lodged.

Later Friday morning, the jurors communicated again to the judge: "We are currently stuck at a [*sic*] 10-2 and seem to be unable to resolve the differences. Please advise!" Defense counsel opined that it was now appropriate to read the "Rodriquez" charge, and the judge instructed consistent with *Commonwealth v. Rodriquez*, 364 Mass. 87, 101-102 (1973).[13] Later that day (the time is not recorded), the jury sent another note, reminding the judge that two jurors had airline travel scheduled for that weekend: "[Juror no. 8] and her husband have non-refundable tickets to Finland. [Juror no. 7's] trip is an important business trip that has been planned for some time. We would appreciate the opportunity to follow our plans." After discussion with counsel, the judge decided to delay answering the question. Defense counsel made no objection, but stated he would "hold [his] remarks."

---

[12]On the first day of deliberations, the jurors had requested all of Harper's testimony. The judge informed them, after consultation with counsel, that the court could not reproduce the entire transcript of a witness's testimony on "short notice."

[13]The purpose of this instruction is to inform the jury concerning their decision-making process in the event it appears they may be deadlocked. See *Commonwealth v. Rodriquez*, 364 Mass. 87, 101-102 (1973) (Appendix A).

That afternoon, the jurors asked, "Would it be possible to resume deliberations on Monday. We are still at an impass[e]. Also do you have an answer regarding the trips." The judge believed the jury note indicated "commitment" to continue deliberations and that there was "good cause" to excuse the two jurors based on the judge's prior promise to do so if deliberations extended beyond Friday. The judge was concerned also that there might be "coercion" if the jurors were not excused. Although acknowledging that the judge had committed to releasing the jurors in these circumstances, defense counsel objected to doing so. He asked that if the two jurors were excused, the judge not inform the remaining jurors about how deliberations would proceed until Monday. The judge agreed.

The judge spoke to the entire jury Friday afternoon, stating that she would permit juror no. 7 and juror no. 8 to choose whether to remain on the jury. She also explained that if the jurors chose to leave they would be replaced by alternates and that further instruction would be provided on Monday.[14] She added that their note indicated to her that they wished to continue on Monday "and it is desirable that you do so."

The judge then addressed juror no. 7 and juror no. 8 individually. Juror no. 8 repeated that her tickets were nonrefundable, and she was excused upon a finding of good cause. Defense counsel did not object and does not appear to challenge this decision now. The judge asked juror no. 7 if she wished to be excused. The entire colloquy with the juror is reproduced in the margin[15]; essentially, the juror indicated that she had a preplanned business trip that could possibly be postponed if the judge thought the juror should stay. Ultimately, the juror stated

---

[14]On appeal, the defendant contends that the judge "concealed" from the jurors that they would be required to begin deliberations anew on Monday. This is the approach defense counsel requested at the time, and the judge did not abuse her discretion by proceeding in this manner.

[15]JUDGE: "Can you tell us now whether you wish to be excused from further jury service?"

JUROR: "It's a business trip and I would like to go. And I think it would be good to get a new mix of people there."

JUDGE: "We can't talk about that."

that the trip was important and "I probably should be excused." The judge excused the juror.

On Monday morning, the judge informed the remaining members of the jury that the two jurors had been excused for "good cause," consistent with her earlier commitment to them; the two alternates joined the jury; a new foreperson was appointed; and the judge instructed the jurors to begin their deliberations anew. Shortly after 4:30 P.M. that afternoon, the jury returned a verdict finding the defendant guilty of both charges.

The replacement of a deliberating juror is governed by G. L. c. 234A, § 39, which provides in relevant part: "The court shall have the discretionary authority to dismiss a juror at any time in the best interests of justice. . . . The court shall have authority to excuse and discharge a juror participating in jury deliberations after a hearing only upon a finding of an emergency or other compelling reason." Similarly, G. L. c. 234, § 26B, provides that the trial judge may discharge a deliberating juror who "is unable to perform his duty for any . . . good cause shown."

Although judges must exercise caution in discharging a deliberating juror, see *Commonwealth* v. *Cassidy*, 410 Mass. 174, 178-179 (1991), the judge has discretion to decide whether a juror is unable to perform his or her functions, see *Commonwealth* v. *Daughtry*, 417 Mass. 136, 146 (1994), and whether good cause, personal to the juror, exists for dismissal, see *Commonwealth* v. *Francis*, 432 Mass. 353, 367-369 (2000). Here, the judge's discharge decision must be considered in the light of her earlier commitment to the jurors, a promise made with no objection by the defendant. Clearly, in this situation, the

---

JUROR: "I'm sorry. It is a business trip. I mean, if you think it would be relevant for me to stay, I could call my boss, but it's been planned for a month and it's rather important."

JUDGE: "Well, I won't get into the details of it. But what I will say is it is desirable for you to continue to serve on the jury. But if you tell me that it's important for you to honor the commitment that you made to your employer, I am prepared to excuse you, if that's what you wish to do."

JUROR: "Well, it's an important customer waiting a month for me because of other trips. So I guess I probably should be excused."

judge did not abuse her discretion by discharging juror no. 8, who had nonrefundable tickets for a trip to Finland.

As to juror no. 7, we do not substitute our view for that of the judge, who was in the best position to assess the juror. See *Commonwealth* v. *Francis*, 432 Mass. 353, 369 (2000). It was not an abuse of discretion to discharge juror no. 7. Indeed, the judge was entitled to consider that if she pressured the juror to contact her employer or to remain on the jury, the juror might have rushed the jury to a verdict in order to return to her work as soon as possible.[16]

In addition, in order to set aside the verdict, the defendant must show prejudice. See G. L. c. 234A, § 74 (no irregularity in discharging juror sufficient to set aside verdict unless objection made and objecting party specially injured or prejudiced thereby). See also *Commonwealth* v. *Robinson*, 449 Mass. 1, 11 (2007). There is no basis for the defendant's speculation that the juror requested to be excused because she was a "holdout." The juror had revealed her business trip plans during empanelment and all parties were well aware of the issue. As stated, the defendant did not object to seating this juror. Cf. *Commonwealth* v. *Francis*, 432 Mass. 353, 369 (2000) (juror's request to be discharged on first day of deliberations made it unlikely that her emotional difficulties in addressing case were due to stress from being hold-out juror, or because jury was at impasse).

The juror's statement that "a new mix of people" might be desirable does not indicate that she was one of the minority of two votes, nor even that the "10-2" split the jurors had earlier reported was in favor of conviction. Finally, the alternates selected were jurors whom the defendant had agreed could be seated; they had heard all the evidence; and the judge carefully instructed the newly constituted jury to begin their deliberations anew. See *Commonwealth* v. *Robinson, supra.*

6. *Polling the jury.* The defendant claims that the judge omit-

---

[16]The situation in this case leads us to recommend that judges not seat jurors who have travel plans that may conflict with the completion of the trial. As indicated, once a commitment is made to release such jurors, any resolution of the matter creates an appellate issue. Even if empanelment must continue for an extra day to obtain an additional juror or jurors, it is preferable to the creation of these problems.

ted the word "unanimously" at the end of her instruction inform-
ing the jury that they must reach a unanimous verdict as to each
theory of liability. The instruction is reproduced in the margin.[17]
There was no objection and there was no error. The judge's
instruction was correct and perfectly clear.

After the jury returned the verdict, the judge polled the jury
at the defendant's request. The defendant contends that the
judge abused her discretion by polling the jurors only generally
on the murder verdict and not on each of the theories of murder
on which they found guilt. The defendant did not make such a
request at trial. The judge is not required to poll the jury at all
in the absence of "specific evidence that the verdicts [we]re not
unanimous." *Commonwealth* v. *Wilson*, 427 Mass. 336, 356
(1998). In addition, there is no requirement that jurors be polled
separately as to each theory of liability.

7. *Ineffectiveness of trial counsel.* The defendant maintains
that his trial counsel was ineffective in several respects. The
standard for a claim of ineffective assistance of counsel is set
forth in *Commonwealth* v. *Saferian*, 366 Mass. 89, 93-98 (1974).
The record here has not been developed on these claims. See
*Commonwealth* v. *Diaz*, 448 Mass. 286, 289 (2007) (claims of
ineffective assistance should normally be raised by motion for
new trial in which appropriate factual record can be developed).
A laundry list of alleged deficiencies such as the defendant
presents here does not substitute for development of a record.

There is no evidence that counsel failed to test or otherwise
investigate key physical evidence offered by the Commonwealth;
nor did the defendant present evidence of the expected content of
testimony from two witnesses whom he claims should have been
called. No record citation is provided regarding counsel's alleged
failure to object to expert testimony, and we are not informed as
to what instructions should have been given regarding such testi-
mony. The defendant does not explain how he was prejudiced
when the judge provided Rotunda Harper's testimony to the

---

[17]"Before you may convict the defendant of murder in the first degree, you
must be unanimous as to the theory under which you are finding him guilty.
You may convict the defendant under more than one theory, but you must be
unanimous, that is, all twelve of you must agree as to each theory under
which you find him guilty."

jury. Failure to request an "honest but mistaken" instruction as to the identification of the defendant by Rotunda Harper was not a "manifestly unreasonable" decision. See *Commonwealth* v. *Hudson*, 446 Mass. 709, 715-716 (2006), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998), and cases cited ("An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made"). The defendant was well known to the two identification witnesses, so mistaken identification was unlikely. The defense counsel chose to stress instead that these witnesses had lied, and it was that theme that was suggested in the opening and closing statements as well as in the cross-examination of those witnesses.[18] This was not an unreasonable tactical decision.

8. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record and perceive no reason to exercise our extraordinary powers to reduce the verdict or order a new trial.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

[18]The defendant's *Moffett* brief, see *Commonwealth* v. *Moffett*, 383 Mass. 201, 208 (1981), recasts some of the issues we have considered.