COMMONWEALTH *vs.* FRANTZ KEBREAU.

Essex. April 7, 2009. - July 16, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Rape. Indecent Assault and Battery. Assault and Battery. Threatening. Evidence,* First complaint, Privileged communication, Communication to clergyman. *Privileged Communication. Practice, Criminal,* Argument by prosecutor.

At the trial of indictments charging the defendant with rape of a child, indecent assault and battery on a child under fourteen, assault and battery, and threatening to commit a crime, the judge did not err in allowing the testimony of two first complaint witnesses, where the victim's disclosures involved multiple and increasingly more serious assaults during a lengthy period, and the two disclosures were made separately, one toward the beginning and the other at the end of this period, and concerned significantly different types of assault [292-296]; further, other witness testimony did not constitute multiple first complaint testimony, where that testimony was introduced to rebut questions raised by the defendant [297-298], and one brief portion that was improperly admitted did not create a substantial risk of a miscarriage of justice [298]; likewise, admission of testimony from both the victim and a police officer concerning the victim's speaking to police and obtaining a restraining order was proper, as it was an attempt to rehabilitate the victim in response to cross-examination [298-299]; finally, the victim's description of a meeting with the defendant, which was attended by others, was not equivalent to having all the attendees testify and repeat the victim's account, but rather provided context for the defendant's admissions at that meeting [299-300].

At the trial of indictments charging the defendant with rape of a child, indecent assault and battery on a child under fourteen, assault and battery, and threatening to commit a crime, counsel was not ineffective for failing to object to one victim's testimony about the circumstances of seeking a restraining order, where, given the absence of physical evidence, attacking the victim's credibility was not a manifestly unreasonable strategy, even where it ultimately resulted in the admission of some evidence that the jury might otherwise not have heard. [300-301]

A Superior Court judge did not err in denying the criminal defendant's motion to suppress inculpatory statements made during a meeting at a church, where the statements were not made in the process of seeking spiritual advice or comfort, and were not motivated by a religious or spiritual purpose. [301-303]

During closing argument at a criminal trial, the prosecutor permissibly argued from the evidence that the Commonwealth's witnesses were credible, and nothing in her remarks indicated that she had personal knowledge of the

witnesses' credibility or any independent knowledge of evidence not before the jury; moreover, the prosecutor was entitled to respond to vehement attacks that the defendant's counsel had made on those witnesses' credibility during his own closing argument. [303-305]

INDICTMENTS found and returned in the Superior Court Department on October 16, 2002.

A pretrial motion to suppress evidence was heard by *David A. Lowy*, J., and the cases were tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Iris Alkalay* for the defendant.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

*Lydia Watts, Brenda R. Sharton, Jennifer M. Mendola, & James M. Hlawek*, for Victim Rights Law Center & others, amici curiae, submitted a brief.

COWIN, J. The defendant was convicted by a Superior Court jury of two counts of rape of a child, four counts of indecent assault and battery on a child under fourteen, and one count each of assault and battery and threatening to commit a crime.[1] The victims were the defendant's two daughters, Rachel and Patricia.[2] The defendant appeals from his convictions on the grounds that the judge erred in allowing the testimony of multiple first complaint witnesses, improperly admitting other testimony that introduced first complaint evidence "through the back door," and denying the defendant's motion to suppress inculpatory statements that, he asserts, were protected by the priest-penitent privilege. The defendant argues further that the prosecutor impermissibly vouched for witnesses during her closing argument. For all these reasons, the defendant requests that we reverse the judgment and order a new trial.

We conclude that the first complaint doctrine, see *Commonwealth* v. *King*, 445 Mass. 217, 242-243 (2005), cert. denied, 546 U.S. 1216 (2006) (*King*), permits testimony from two first

---

[1]The defendant was acquitted of a charge of incest.

[2]We refer to the victims by the names used by the parties. See G. L. c. 265, § 24C.

complaint witnesses in circumstances such as those here, where each witness testifies to disclosures made years apart concerning different periods of time and escalating levels of abuse, which constitute different and more serious criminal acts committed over a lengthy period. In addition, the other multiple witness complaint testimony to which the defendant objects was properly admitted, not as first complaint testimony, but rather in response to cross-examination by the defendant and contentions raised in his defense. We conclude further that the defendant's inculpatory statements were not protected by the priest-penitent privilege because they were not made in the course of seeking spiritual comfort or guidance. We determine also that there was no vouching in the prosecutor's closing argument. We therefore affirm the defendant's convictions.[3]

*Background and proceedings.* We recount the facts from evidence at trial, reserving specific details for later discussion. The defendant began sexually abusing his older daughter, Rachel, when she was in sixth grade, and his younger daughter, Patricia, when she was in third grade. The assaults continued throughout the girls' high school years.[4] The assaults against Rachel escalated from sexualized touching to digital penetration when Rachel was in junior high school to penile penetration when she was in ninth grade. The incidents became less frequent in Rachel's later high school years; she sought to avoid being around her father. Later, Rachel did not return home from college on weekends. The last incident occurred when Rachel was home for Thanksgiving break during her freshman year at college. When the defendant attempted to touch Rachel, she refused and threatened to call the police. The defendant became angry, showed Rachel a nine millimeter handgun, and said, "I could kill you if you ever open your mouth." Although the defendant did not touch Rachel after this incident, she continued to fear for her safety and for that of her mother.

---

[3]We acknowledge the amicus brief in support of the Commonwealth submitted by the Victim Rights Law Center; the Boston Area Rape Crisis Center; The National Crime Victim Law Institute; The Domestic & Sexual Violence Council, Inc.; The Illinois Coalition Against Sexual Assault; and Jane Doe, Inc.

[4]At the time of trial, Rachel was twenty-nine years old and Patricia was twenty-two years old.

The assaults against Patricia followed a similar pattern of escalation while Patricia was in elementary and junior high school, and became less frequent during her high school years as well.[5] Patricia often stayed away from home during junior high and high school; when the defendant attempted to assault her, she at times told him not to touch her or put out her hand to stop him. On one occasion when Patricia was sixteen or seventeen, the defendant grabbed her by the throat, pinning her against a wall, because she did not respond quickly enough when he called her. The defendant also attempted sexual assaults on Patricia on her visits home from college, but she fended off his attempts.

Rachel first disclosed the abuse to her mother, Solange, when she was in seventh or eighth grade.[6] After Rachel told Solange that the defendant had been touching her inappropriately, Solange confronted the defendant, who responded by yelling at Solange. A few days later, the defendant told Rachel that she should not have disclosed the abuse to her mother, that nothing would come between him and his wife, and that, in any case, no one would believe Rachel. There was no further discussion of the abuse until Rachel disclosed to Azanda Seymour, an academic advisor at her college, that she did not want to go home because her father was molesting her. Seymour referred Rachel to the school's counselling center, and also attended a counselling meeting with Rachel.

When Patricia was a senior in high school, she disclosed the abuse to Ralph Massillon ("Pastor Ralph"), one of the pastors at her church. Patricia told Pastor Ralph that she had not disclosed the abuse previously because she did not think that anyone would believe her and because the defendant had threatened her if she did so. Pastor Ralph suggested alternative actions that Patricia could take, including contacting the police or confronting her father, but Patricia decided that the best option would be to leave home to attend college. However, after a long weekend home from college in February, 2002, Patricia informed Pastor Ralph that she wanted to confront the defendant.

---

[5] The defendant's abuse of Patricia, however, did not include sexual intercourse.

[6] Because the defendant and his wife share the same last name, we refer to the defendant's wife by her first name.

A family meeting was held at the church in February, 2002. The defendant's two daughters, their mother, Pastor Ralph, two other pastors, and the defendant attended the meeting. During the meeting, the defendant made inculpatory statements to Pastor Ralph and the other pastors. The defendant apologized to his daughters for "what he did" and asked for forgiveness.[7] The meeting ended without agreement concerning any future action.

Several weeks after the meeting, Solange informed her son James of what had occurred at the meeting. With Solange present, James confronted the defendant, who stated, without specifying further, that he had done inappropriate things to Rachel, but denied harming Patricia. The defendant was upset and crying during this encounter, and said to James, "What do you want me to do? Do you want me to kill myself?"

The defendant was asked to leave the family home. He initially agreed to do so, but then refused to move. He became angry and verbally abusive. Eventually, in September of 2002, Rachel and Solange went to the Lynn police department. At the suggestion of the detective who conducted the interview, Rachel and Solange obtained a restraining order against the defendant. The defendant was arrested a few days later.

Prior to trial, asserting that his statements at the church meeting were protected by the priest-penitent privilege, the defendant moved to suppress these statements. After an evidentiary hearing, the trial judge denied the motion. The defendant sought relief pursuant to G. L. c. 211, § 3. A single justice of this court denied the defendant's petition.

The decision in *King, supra*, which replaced the fresh complaint doctrine with the first complaint doctrine, was decided a few weeks before the trial in this case. *King* provided that its changes would apply to sexual assault cases tried after the issuance of the rescript in that case. See *id.* at 218, 248. The rescript issued during the present trial.

At the beginning of the trial, the Commonwealth filed motions in limine to allow testimony from multiple first complaint witnesses. The trial judge ruled that one first complaint witness,

---

[7]Pastor Ralph testified that the defendant apologized to and sought forgiveness from both daughters; Patricia, Solange, and Rachel testified that the defendant apologized only to Rachel.

Pastor Ralph, could testify as to the abuse of Patricia and two first complaint witnesses, Solange and Seymour, could testify concerning the abuse of Rachel. The defendant did not object to the first complaint witness for Patricia, but did object to the two first complaint witnesses for Rachel. The judge instructed the jury on first complaint witnesses pursuant to *King, supra* at 247-248.

The jury convicted the defendant of eight of the nine charges for which he had been indicted; the defendant was found not guilty of incest. This appeal ensued. We transferred the case from the Appeals Court on our own motion.

*Discussion.* 1. *First complaint testimony.* a. *Multiple first complaint witnesses.* The defendant claims that the judge should not have permitted testimony of two first complaint witnesses regarding Rachel's complaint. He argues here, as he did at trial, that this violated the first complaint doctrine set forth in *King, supra* at 242-243. That doctrine permits only one witness to testify to a complainant's report of an alleged assault. That witness, who ordinarily will be the first person to whom the alleged victim disclosed the assault, may testify to "the details of the alleged victim's first complaint of sexual assault [including the victim's statement of the facts of the assault] and the circumstances surrounding that first complaint as part of the prosecution's case-in-chief." *Id.* at 243. The complainant may also testify to the details of the first complaint and why the complaint was made at that time. *Id.* at 245.

The first complaint doctrine was designed to help counterbalance the continuing inaccurate assumptions about delayed reporting by victims of sexual assaults, which may lead juries to view skeptically statements by rape victims if the assault is not reported contemporaneously. *Id.* at 240-241. Allowing only one first complaint witness to testify addresses this concern while avoiding the prejudice to the defendant that could result from a "piling on" of multiple witnesses' testimony that might unfairly bolster the complainant's credibility. *Id.* at 245. In certain circumstances, such as when the first person told of the alleged assault is "unavailable, incompetent, or too young to testify meaningfully," the trial judge may admit testimony from a substitute first complaint witness. *Id.* at 243-244.

As stated, the hearing on the Commonwealth's motions concerning the first complaint witnesses was conducted immediately after our decision in *King, supra.* The first complaint rule set forth in *King* became effective as of October 27, 2005, prior to the judge's charge to the jury. The judge's decision on the motions was based on his thoughtful and well-reasoned interpretation of that decision. He allowed both Rachel's mother, Solange, and her academic advisor, Seymour, to testify as first complaint witnesses for Rachel because he concluded that Rachel's statements to Seymour were made in respect to different and escalating incidents of abuse, and that there would be no "overlapping incidents." The judge reasoned that our holding in the *King* case could not have been intended to exclude first complaint testimony about a rape that occurred after disclosure of a lesser offense to an earlier witness. He determined, therefore, that Solange could testify to the disclosure of events from the beginning of the abuse until Rachel was thirteen or fourteen years old and that Seymour could testify to the disclosure of later incidents.

The defendant contends that Seymour should not have been allowed to testify at all since *King* permits only one first complaint witness and Solange was the proper first complaint witness in this case. The defendant asserts that Seymour's testimony was unnecessary "piling on" and unduly prejudicial because it unfairly bolstered Rachel's credibility in the manner that *King* sought to avoid. The defendant argues that the judge misinterpreted our holding in *King*, and that each incident could not be treated as a separate incident to which a new first complaint witness may testify.

In addition, the defendant maintains that, even if testimony from two first complaint witnesses is permissible in certain circumstances, those circumstances were not present here. The defendant argues that the judge misconstrued the testimony given by the two first complaint witnesses because their testimony did not describe different incidents. The defendant claims that Rachel's disclosure to Seymour did not indicate that the defendant's acts escalated over time, but rather essentially repeated the disclosure about inappropriate "touching" that she made to Solange. Alternatively, the defendant argues, if Solange's testimony was likely to be inaccurate or incomplete because of a conflict of interest, or

if Seymour's testimony was required to show escalation, then Seymour alone should have been permitted to testify as the first complaint witness. See *Commonwealth* v. *Murungu*, 450 Mass. 441, 446 (2008) (exception to first complaint witness limitation where first complaint witness has obvious bias or reason to minimize or distort victim's complaint).

There was no error in the judge's decision to permit both Solange and Seymour to testify. As the judge observed, the circumstances in *King* were quite different from those in this case because they involved multiple witnesses testifying to reports of a single assault. Our discussion of the first complaint doctrine in that case, therefore, arose in the context of a single assault. See *King*, *supra* at 218-220, 235, 242-244. Here, however, the disclosures involved multiple and increasingly more serious assaults during a lengthy period. The two disclosures were made separately, one toward the beginning and the other at the end of this period, and they concerned significantly different types of assault.

As stated, Rachel's first disclosure to her mother, when she was in seventh or eighth grade (1988-1990), was made after years of sexual abuse involving genital touching that began when Rachel was in the sixth grade (1987-1988). The abuse later escalated to digital penetration, and, ultimately, to sexual intercourse when Rachel was in the ninth grade (1990-1991). The instances of rape continued for a period of years. Rachel's second disclosure, after the rapes had occurred, was made to her college advisor (1994). The defendant was charged separately with different offenses arising out of the different circumstances; he was indicted on charges of indecent assault and battery for the earlier occurrences and rape and incest for the later events. The judge relied properly on both the different time frames and the escalating nature of the abuse in determining that two first complaint witnesses could testify.

To deprive the Commonwealth of the ability to introduce the first complaint testimony from Seymour, the college advisor, which concerned a separate and more serious crime, would have defeated the purpose underlying the first complaint doctrine. See *Commonwealth* v. *Murungu*, *supra* at 446 (first complaint doctrine counteracts frequent perception that years of silence following

sexual assault means that complainant may have fabricated claim). In the circumstances of this case, if the jury had heard that Rachel complained to her mother of the defendant's touching her "where he should not," but then heard no evidence that, as an older teenager, Rachel had disclosed the subsequent events, the jury might have concluded that the rapes were a fabrication. Allowing only Seymour to testify, however, would also have been unfair; the jury could have questioned Rachel's credibility for enduring the abuse for years without any complaint.[8]

In an effort to avoid any "piling on" of testimony by Seymour concerning incidents described in Rachel's disclosure to her mother, see *Commonwealth* v. *Stuckich*, 450 Mass. 449, 451 (2008), the judge repeatedly instructed the prosecutor, both prior to and during the trial, that each first complaint witness could testify only to events within carefully delineated time frames. The judge provided proper limiting instructions on the use of first complaint testimony after Rachel's testimony about her disclosures, after each first complaint witness's testimony, and again during his jury charge. See *King, supra* at 247-248.

The defendant contends further that it is irrelevant that the two disclosures involved escalating abuse because Rachel did not refer to the rape in describing her statement to Seymour. This issue arose because at trial Rachel testified, inconsistently with the characterization proffered by the prosecutor during the hearing, that she made only the same vague, general disclosure to both witnesses. She testified that she disclosed inappropriate "touching" to her mother and that she told Seymour that the defendant "molested" her.[9]

Nonetheless, at the hearing on the motion in limine, the

---

[8]The defendant argues that, in testifying about her disclosure to Seymour, Rachel should not have been permitted to mention attending a campus counselling session with Seymour. Rachel testified that she told Seymour she did not want to go home; Seymour then brought her to the counselling center; and Rachel then disclosed to Seymour for the first time, during a counselling session, that the abuse had occurred. There was no objection to this statement at trial. Because Rachel testified that her disclosure to Seymour was not made until the counselling session, the statement was necessary as part of the context in which Rachel made that disclosure. In addition, the statement, unaccompanied by details, did not imply that Seymour believed Rachel or that she took any action as a result of the disclosure.

[9]It may well be, as a sidebar discussion indicates, that discussion of the

prosecutor described with specificity the different acts encompassed by each disclosure and the time period in which those acts occurred. The judge properly determined to admit both first complaint witnesses based on the prosecutor's proffer of evidence of different types of escalating assaults during different time periods. Although the defendant objected to the judge's initial determination to permit both first complaint witnesses, he did not object at the time of Rachel's trial testimony describing her second disclosure, nor did he object when Seymour testified.[10] See *Commonwealth* v. *Whelton,* 428 Mass. 24, 25 (1998) (motion in limine seeking pretrial evidentiary ruling insufficient to preserve appellate rights unless there is objection at trial). Moreover, nothing in the record suggests, nor does the defendant imply, that the prosecutor had any basis prior to trial to believe that Rachel would testify that she had complained only of "molestation" to Seymour. Given the circumstances here, the judge's determination to admit the testimony of both first complaint witnesses was appropriate.

We emphasize that the Commonwealth may not introduce a "parade of multiple complaint witnesses" in a case involving repeated instances of abuse by a single defendant. See *Commonwealth* v. *Stuckich, supra* at 457, n.11. We state only that, in the circumstances here, where there was both ongoing abuse over a period of many years and escalating abuse during that period, with disclosures at two widely separated intervals, the judge's decision to allow two first complaint witnesses was appropriate. Any determination concerning first complaint testimony is fact-specific and requires, in the first analysis, a careful evaluation of the circumstances by the trial judge. See *Commonwealth* v. *Murungu, supra* at 446-447. Judges and attorneys are apprised, however, to be cautious in ensuring that, if more than one first complaint witness is allowed, the complaint testimony introduced at trial must relate to different crimes.

second disclosure was deliberately vague in an effort by all parties to avoid an issue concerning another potential victim-witness to whom Rachel also made a disclosure.

[10]A second witness, to whom Rachel had made a detailed disclosure of incidents of rape while she was in high school, had been expected to testify about Rachel's disclosure. That witness, however, became unavailable during trial and Seymour testified as a substitute complaint witness.

b. *"Back door" first complaint testimony.* The defendant contends also that other witness testimony was improperly admitted essentially as multiple first complaint testimony. First, the defendant asserts that portions of Seymour's testimony concerning Seymour's interactions with third parties should not have been allowed. Seymour testified that, following Rachel's disclosure, she consulted with her director concerning the best course of action. The director told Seymour to refer Rachel to the campus counselling center; Seymour did so and then brought Rachel to the center for a counselling session.[11] In addition, Seymour spoke with the Department of Children and Families, then known as the Department of Social Services (DSS). The defendant claims that each of these pieces of evidence unfairly bolstered Rachel's credibility by suggesting that Seymour and the director found Rachel's allegations believable. Since the defendant did not object to Seymour's testimony about her reports to third parties,[12] we consider whether the testimony was properly admitted and, if not, whether the testimony created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas,* 430 Mass. 8, 17 (1999).

The theory of the defense was that Rachel and Patricia had fabricated or embellished their claims of sexual abuse because they resented the defendant's harsh upbringing and strict disciplinary techniques (including beatings), his extramarital affairs and out-of-wedlock children, his failure to work while his wife worked two jobs, and also because they wanted him to move out of the house. Therefore, much of the defendant's cross-examination was directed at questioning the victims' credibility and emphasizing any discrepancies in their testimony.

Seymour's testimony concerning speaking with her director and her testimony about attending the counselling session with Rachel was introduced in response to cross-examination by the defendant. Rachel had testified differently at trial about the sequence of events surrounding her disclosure to Seymour than

[11]The sequence of events surrounding the disclosure that Seymour described differed from the sequence of events that Rachel described; as stated, see note 8, *supra*, Rachel testified that she first made the disclosure to Seymour at the counselling session.

[12]The defendant objected only when Seymour began to recount what she had been told by the DSS representative; the judge properly sustained that objection.

she had in statements contained in a Lynn police report. Rachel's disclosure to the Lynn police matched the sequence of events that Seymour described at trial, but did not coincide with Rachel's trial testimony. The defendant sought to exploit these differences as part of his strategy to discredit Rachel and Patricia's testimony. Because Seymour's testimony was introduced to rebut questions raised by the defendant, it was not first complaint testimony and was therefore properly admitted.

Concerning Seymour's testimony about her conversation with DSS, the Commonwealth appropriately conceded at oral argument that the testimony was inadmissible. Admission of this evidence did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas*, 430 Mass. 8, 17 (1999). Seymour's brief mention that she called DSS only for purposes of obtaining information, because she was a relatively new counsellor and wanted to follow proper procedures, could have had slight, if any, effect on the outcome. Unlike the testimony at issue in *Commonwealth* v. *Stuckich*, *supra* at 456, where the guidance counsellor testified that she believed the complainant and immediately filed a report of abuse with DSS, Seymour's testimony did not create a strong impression that Seymour found Rachel's complaint to be credible.

Next, the defendant contends that Rachel's statements about speaking to the Lynn police and obtaining a restraining order should not have been allowed because they unfairly repeated her story and buttressed her credibility. See *Commonwealth* v. *Stuckich*, *supra* at 457 (allowing victim to testify to multiple complaints is essentially permitting those other witnesses to testify). The defendant cross-examined Rachel in an attempt to discredit her testimony by showing that she fabricated detailed allegations of abuse in order to obtain a restraining order.[13] The statements of

---

[13]The defendant claims in addition that Patricia's testimony that she went to the Lynn police to obtain a restraining order should not have been allowed. When the prosecutor initially asked Patricia whether she, too, reported the abuse to the Lynn police, the judge, sua sponte, ordered that line of questioning stopped and the testimony struck, despite defense counsel's failure to object. Nonetheless, when the prosecutor subsequently asked Patricia, after Patricia's testimony concerning the meeting at the church, whether she at some point went to the Lynn police, the defendant again did not object. Patricia replied, without further details, that she did so for the purpose of obtaining a restraining order. While this testimony was impermissible, there was no

which the defendant complains were introduced on redirect examination in response to the defendant's extensive cross-examination, and were therefore permissible. Once the defendant opened the door on cross-examination, the Commonwealth was entitled to attempt to rehabilitate the witness. See *Commonwealth* v. *Mendes*, 441 Mass. 459, 469-470 (2004) (prosecutor entitled to rehabilitate witness and witness may properly explain on redirect examination testimony elicited on cross-examination).

In addition, the defendant argues that Christine Sporanza-Petrusella, the detective who first interviewed Rachel and who assisted Rachel in obtaining the restraining order, should not have been permitted to testify. Although there was no objection to her testimony at trial, the defendant asserts that the detective's testimony about her interview with Rachel was further piling on of first complaint testimony that should have been excluded. See *Commonwealth* v. *Arana*, 453 Mass. 214, 229 (2009). The testimony was properly admitted. As the judge commented when Rachel initially testified about her conversation with the detective, this testimony was allowed not as first complaint testimony but in response to the defendant's cross-examination of Rachel about Rachel's attempts to obtain a restraining order.[14] See M.S. Brodin & M. Avery, Massachusetts Evidence §§ 6.19, 6.23-6.24 at 368, 374-376 (8th ed. 2007). See also *Commonwealth* v. *Hall*, 66 Mass. App. Ct. 390, 394-395 (2006) (where defendant has raised issue of witness's credibility, evidence relevant to correcting jury's possibly mistaken conclusions about witness's state of mind based on defendant's questions is admissible).

Finally, the defendant contends that Rachel should not have been allowed to testify, in her description of the meeting at the church in February, 2002, that she there disclosed to her mother for the first time details of the defendant's abuse. The defendant

substantial risk of a miscarriage of justice. See *Commonwealth* v. *Comtois*, 399 Mass. 668, 674 (1987). The jury had already heard graphic details concerning Rachel's efforts to obtain a restraining order during the defendant's cross-examination of Rachel. That Patricia also sought a restraining order would have had little effect, if any, on the jury.

[14]The defendant asserts also that the detective's testimony that, based on Rachel's statements, she sought a warrant for the defendant's arrest, was impermissible. There was no error. This testimony was elicited by the defendant in an attempt to show that the detective conducted a hasty and shoddy investigation before seeking a warrant.

claims also that Rachel's statement that she described at the meeting "everything" that she had testified to in court concerning the defendant's actions, including sexual intercourse, should have been excluded. The defendant asserts that this testimony was equivalent to having all of the attendees at the meeting testify and repeat Rachel's account of the events. There was no error. This testimony was not offered as first complaint testimony, but rather to provide context for the defendant's admissions at the meeting and his statement that the things that Rachel had been describing did occur.

c. *Ineffective assistance of counsel.* The defendant's claim that his counsel was ineffective for failing to object to Rachel's testimony about the circumstances of seeking the restraining order is also unavailing.[15] As discussed, *supra*, it was defense counsel, during cross-examination, and not the prosecutor, who introduced the evidence that Rachel had sought a restraining order because of a sexual assault. To the extent that the defendant implies that his counsel was ineffective for pursuing such questions, his claim fails. The questions were part of counsel's obvious strategy to discredit both Rachel and Patricia by asserting that their hatred and fear of the defendant induced them to fabricate their claims of sexual abuse as a means of revenge for his earlier harsh discipline, extramarital affairs, out-of-wedlock children, and failure to provide for the family.

Given the absence of physical evidence, this case turned on the daughters' credibility. Thus, attacking the daughters' credibility was not a manifestly unreasonable trial strategy, even where this strategy ultimately resulted in the admission of some evidence that the jury might otherwise not have heard. See *Commonwealth* v. *Diaz*, 448 Mass. 286, 288 (2007) (when attorney's conduct represents strategic or tactical decision, defendant must demonstrate that attorney's decision was "manifestly unreasonable" when made). As the judge commented during the precharge conference, the defendant deliberately chose to introduce much prior

---

[15]In analyzing a claim of ineffective assistance of counsel, we review the claim to determine whether trial counsel's actions fell "measurably below that which might be expected from an ordinary, fallible attorney — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

bad act evidence that could have been properly excluded, without requesting limiting instructions, as part of his trial strategy to show that members of his family desired revenge and thus lied about the sexual assault charges. Counsel was not ineffective for pursuing such a strategy in the face of powerful evidence against the defendant that included the defendant's confessions to three different witnesses in addition to his daughters' testimony concerning his apology.

2. *Priest-penitent privilege.* The defendant argues that the judge erred in denying his motion to suppress his inculpatory statements made at the family meeting at the Haitian Baptist Church in February, 2002, because the statements were made in the course of seeking spiritual guidance and counselling from pastors of that congregation. Pursuant to G. L. c. 233, § 20A,

> "A priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner shall not . . . testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, without the consent of such person."

Although the testimonial privilege conferred by G. L. c. 233, § 20A, is strictly construed, see *Matter of a Grand Jury Subpoena*, 447 Mass. 88, 90 (2006), the limits of what constitutes "seeking religious or spiritual advice or comfort" have not been defined to any great extent in our cases.

Here, the trial judge denied the defendant's motion to suppress inculpatory statements during the family meeting because he concluded that the defendant's statements were not made in the process of seeking "spiritual advice or comfort," and were not "motivated by a religious or spiritual purpose." See G. L. c. 233, § 20A. Based on this conclusion, the judge stated that he need not reach the Commonwealth's argument that any privilege was waived due to the presence of the defendant's daughters when some of the statements were made.

We set forth facts derived from the judge's findings based on the evidence at the hearing on the motion to suppress, supplemented by uncontested evidence. The meeting was held in a

classroom at the Haitian Baptist Church in Lynn. Patricia, Rachel, and Solange regularly attended services at this church. The defendant was not a member of the church and attended church services only a few times each year. The meeting was held at Patricia's request so that she could confront her father in a location Patricia believed would be safer than confronting the defendant in his home.

At the beginning of the meeting, Pastor Ralph announced "rules" for the meeting, including that any discussion at the meeting would remain confidential. The meeting became heated at times, and the defendant denied his daughters' descriptions of abuse. The defendant said that he did not think the meeting was the proper place to have such a discussion and that any discussion should take place in the family home. When the defendant attempted to leave the meeting, one of the pastors advised the defendant that he could leave if he chose to do so, but that the meeting would continue in his absence.

During the first of two breaks when, at Pastor Ralph's suggestion, Rachel and Patricia left the room to calm down, the defendant stated that "something" inappropriate had happened with Rachel. He also admitted that some of the events Patricia had reported did happen, but claimed that others had not happened. During the second break, the defendant asked Pastor Ralph what he should do to "make things better." Pastor Ralph told the defendant that he should examine his conscience, and that the response should come from the defendant, not from Pastor Ralph. When the defendant's daughters returned to the room, Pastor Ralph told them that the defendant had something to say to them, and the defendant apologized and asked for forgiveness.

The defendant asserts first that the entire meeting, conducted at the church, led by Pastor Ralph and facilitated by the other two pastors, was held in the context of family counselling for the purpose of "reconciliation and forgiveness," was conducted as part of the pastors' pastoral duties, and therefore was a privileged communication between the pastors and the family as a unit. The defendant argues in addition that, even if he did not originally attend the meeting seeking spiritual support and guidance, the character of his interactions with the pastors changed when he asked Pastor Ralph what he should do to make the situation better.

The judge did not err in denying the defendant's motion to suppress. He found permissibly that the nature of the defendant's participation in the meeting was not "for the purpose of seeking spiritual advice or comfort," but rather to avoid what the judge characterized as the "train going right at [the defendant's] forehead." Whether the defendant's communications at the meeting are protected under the terms of G. L. c. 233, § 20A, is a question of law. Part of this analysis, however, involves factual determinations concerning the defendant's intent in attending the meeting, and his later intent in asking what he should do to "make things better." Such factual determinations are for the trial judge. See *Miller* v. *Milton Hosp. & Med Ctr., Inc.*, 54 Mass. App. Ct. 495, 498-499 (2002) (existence of claimed privilege depends on facts found by trial judge). The evidence clearly supports the judge's conclusion that the defendant did not attend the meeting for a spiritual or religious purpose, but rather attended at the urging of his wife and his wife's pastor to discuss a "family issue."

That the defendant was not a member of the church, and did not attend services regularly, is not dispositive, since the statute plainly applies to "any person . . . seeking religious or spiritual advice." See G. L. c. 233, § 20A. Nonetheless, the defendant's prior sporadic contact with the pastors and lack of regular attendance at church services is relevant to his purpose in attending the family meeting. The defendant's angry demeanor and denials of the allegations, as well as his repeated statements that he wanted to leave the meeting, further support this conclusion.

There was also no error in the judge's finding that the meeting did not change to one in which the defendant was seeking spiritual comfort or guidance during the second break. The defendant's question to Pastor Ralph about what he should do to make it "better," and Pastor Ralph's suggestion that the defendant follow his "conscience," are not inconsistent with the judge's conclusion that the defendant was seeking pragmatic advice rather than spiritual guidance.[16]

3. *Prosecutor's closing argument.* The defendant asserts that

---

[16]Because the defendant's statements were not made in the course of seeking spiritual guidance or support, we need not address whether any privilege was waived by the presence of third parties not covered by the statute. See G. L. c. 233, § 20A.

a new trial is required because the prosecutor vouched for the credibility of a number of witnesses during her closing argument. "Vouching" occurs when a prosecutor expresses his or her own belief in the credibility of witnesses or implies that he or she has knowledge independent of the evidence presented at trial. See *Commonwealth* v. *Sanders*, 451 Mass. 290, 296-297 (2008). Because the defendant did not object to the prosecutor's argument at trial, we review to determine whether the statements were improper and, if so, whether they created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Renderos*, 440 Mass. 422, 425 (2003).

In support of his claim of vouching, the defendant points to three statements by the prosecutor. First, the prosecutor stated, "You have to believe that Solange, [Patricia] and [Rachel] as well as James, [Pastor Ralph] and [Seymour] are all outright liars who have conspired against the defendant to bring this case against him." Later, in reference to both Rachel's and Patricia's eventual decision to go to the police, the prosecutor remarked, "It's not the act of a calculated manipulative liar acting out of revenge. It's the action of a person who is also the victim and a casualty of his victimization." Towards the end of her closing argument, in reviewing the witness testimony beyond that of the defendant's two daughters, the prosecutor said, "Those people[']s corroboration are your moral certainty."

As stated, there was no objection to these statements and no request for curative instructions. See *id.* at 426 n.3. In any event, the prosecutor's statements do not constitute vouching. The prosecutor was entitled, as she did here, to argue strenuously from the evidence that the Commonwealth's witnesses were credible. See *Commonwealth* v. *Dixon*, 425 Mass. 223, 232-233 (1997). Nothing in the prosecutor's remarks indicated that she had personal knowledge of the witnesses' credibility or any independent knowledge of evidence not before the jury. See *Commonwealth* v. *Sanders*, *supra* at 297; *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989).

Moreover, the prosecutor's statements that the jury should find the Commonwealth's witnesses credible were made in the context of the defendant's vehement attack on those witnesses' credibility during his own closing argument. As stated, the case

revolved entirely around the credibility of the witnesses. Not only did the defendant's counsel assert in closing that each of the Commonwealth's witnesses had motives to lie and had, as a group, decided to do so, defense counsel made particular and extensive statements concerning Rachel's and Solange's lack of credibility. Counsel stated repeatedly that Solange was a liar and had "lie[d]" when she took the oath "to God Almighty" to tell the truth during her testimony. Counsel also argued that Rachel "twisted," "turned," and "sp[un]" events in an effort to benefit herself. The prosecutor was entitled to respond to these statements with a forceful argument, based on the evidence and the jury's common sense understanding of the events, that the Commonwealth's witnesses were telling the truth.

*Judgments affirmed.*