NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12227

COMMONWEALTH  vs.  GAUDY ASENJO.

Essex.     February 6, 2017. - August 15, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, & Budd, JJ.

Rape.  Evidence, First complaint, Expert opinion.  Witness, Expert.  Battered Woman Syndrome.

Indictments found and returned in the Superior Court Department on May 22, 2013.

The cases were tried before James F. Lang, J.

The Supreme Judicial Court granted an application for direct appellate review.

Emily A. Cardy, Committee for Public Counsel Services, for the defendant.
David F. O'Sullivan, Assistant District Attorney (Jennifer S. Kirshenbaum, Assistant District Attorney, also present) for the Commonwealth.

HINES, J.  In January, 2015, the defendant, Gaudy Asenjo, was convicted by a Superior Court jury of three counts of

aggravated[1] rape of a child.[2]  The complainant was the defendant's niece, Sara,[3] who was fourteen years of age at the time of the rape.  The defendant appeals from the convictions, claiming that the judge erred in (1) interpreting the first complaint rule to require the disclosure of the perpetrator's identity to the first complaint witness and allowing a police officer to testify as the first complaint witness; (2) allowing the complainant to testify to multiple disclosures of the sexual assault in violation of Commonwealth v. King, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (2006), and its progeny; and (3) precluding expert testimony in support of her defense based on battered woman syndrome.  We conclude that the essential feature of first complaint evidence is the report of a sexual assault, not the identity of the perpetrator.  Consequently, the admission of the police officer's testimony as first complaint evidence was error, which, after viewing the evidence as a whole, was prejudicial.  We conclude also that the judge erred

---

[1] The aggravating factor was the age difference of more than ten years between the defendant and the complainant, who was a child over the age of twelve and under the age of sixteen.  See G. L. c. 265, § 23A.

[2] In a separate trial in April, 2015, her codefendant, Luis Rivera, was acquitted on three counts of aggravated rape of a child.

[3] A pseudonym.  See G. L. c. 265, § 24C.  Sara was born in March, 1996, and she was eighteen years of age at the time of trial.

in admitting the complainant's testimony as to her multiple disclosures of the rape.  Last, we conclude that a defendant asserting duress under G. L. c. 233, § 23F, based on battered woman syndrome, is not required to present affirmative evidence of abuse as a predicate to the defense.  The judge erred in excluding the proffered expert testimony on this ground.  Therefore, based on the foregoing, we reverse and order a new trial.

Background.  We summarize the evidence the jury could have found.  In February, 2011, Sara and her twin sister spent most of their February school vacation at the home of the defendant, their maternal aunt.  One evening, toward the end of the week, Sara, Sara's sister, the defendant's daughter, the defendant, and the defendant's then boy friend, Luis Rivera, were present in the home socializing and drinking alcohol.  Rivera and the defendant had been in a relationship for a long time, such that Sara considered him an uncle.  That evening, Sara was upset with her sister and the defendant's daughter.  Although they were all drinking alcohol, the other girls were also smoking marijuana without including Sara.

After the other two girls went upstairs to go to bed, Sara stayed downstairs talking with the defendant.  At the time, Sara was "really close" with the defendant and thought of her as a "second mom."  During the conversation, the defendant inquired

about Sara's sexual experience and told Sara how satisfying her sexual relationship with Rivera was. Later that evening, the defendant telephoned Rivera, who had left the residence earlier, and asked him to return because Sara wanted him to come back. After the defendant told Sara that Rivera was returning, Sara stated that she had not showered that day. The defendant instructed Sara to go into the bathroom and wipe her vagina clean. The defendant helped Sara remove her pants, and Sara cleaned herself. As the defendant inspected Sara's vagina, she told Sara that Rivera would like it and that he would be "really happy."

Approximately ten minutes later, Rivera arrived at the defendant's home. The defendant suggested that the three of them go into the bathroom, where Sara was instructed to lie down on the floor on her back. After the door was closed and locked, the defendant turned off the lights and illuminated the room with the flashlight application on her cellular telephone. Rivera pulled Sara's pants and underwear down, but left her shirt on. Rivera performed oral sex on Sara, as the defendant sat on the edge of the bathtub watching and asking Sara whether she liked it. Sara did not answer, and instead focused on her upcoming birthday so that she would not have to think about what was happening to her. A few minutes later, Rivera inserted something into Sara's vagina that hurt her. Sara did not know

whether it was his finger or his penis. Rivera directed the defendant to perform oral sex on Sara while he had vaginal intercourse with the defendant.

After the assault ended, Sara went upstairs, where her sister and the defendant's daughter were sleeping. Sara was scared because Rivera was still in the home, but she eventually went back downstairs to use the bathroom. Rivera asked Sara whether she wanted to do it again, but she ignored him, used the bathroom, and ran back upstairs without incident. Sara was hurt and confused, thinking that it was her fault and that she could have done something to stop it. The next morning, the defendant did not speak about the assault, and Rivera returned to the home to bring everyone breakfast. Although Rivera did not speak to Sara that morning, he touched her backside each time he was alone with her.

Sara continued to visit the defendant's home after the assault. Each time Sara visited, she tried to ensure that Rivera was not present. A few weeks after the assault, Sara asked the defendant whether it was possible that Sara was pregnant because she was having stomach pains and had not menstruated that month. The defendant stated that she did not know whether Sara was pregnant, but that if Sara were, she should tell her parents that the father was a boy from school, rather than Rivera.

Over a period of two years after the rape, Sara disclosed the attack on four different occasions. Sara first disclosed the assault within weeks of the incident when she told her cousin Mary[4] that Rivera had raped her at the defendant's home. Sara mentioned the defendant's presence during the rape, but did not disclose her participation. Sara did not mention the defendant's participation because Sara still loved her and did not want to get her into trouble. In December, 2012, Sara disclosed the rape for the second time to her sister and some of their friends at a sleepover while playing a game they called "if you really knew me." Sara revealed that the defendant was present when it happened but again did not disclose her participation. Sara made the third disclosure to her mother within days of the sleepover without mentioning the defendant's role in the rape. Finally, Sara repeated the details of the rape to Detective Ashley Sanborn of the Danvers police department, revealing for the first time the defendant's participation.[5]

---

[4] A pseudonym. See G. L. c. 265, § 24C. Mary's mother is the sister of both the defendant and Sara's mother.

[5] Sara made two disclosures to Detective Ashley Sanborn on January, 2, 2013. The first, which was the basis for Sanborn's first complaint testimony at trial, occurred in the presence of Sara's mother and sister. Sara gave a second, more detailed statement after her mother and sister left the room, in the presence of Sanborn and another detective. Although the judge originally ruled that the Commonwealth could elicit testimony

Sanborn appeared as the Commonwealth's first complaint witness and testified that on January 2, 2013, she spoke with Sara and Sara's family, at the family's request, at the Danvers police station. After Sara's father left the room, Sara disclosed that she had been raped by the defendant and Rivera. Sara's sister also testified regarding Sara's December, 2012, disclosure.

Discussion. 1. First complaint evidence. On the first day of trial, the Commonwealth moved to introduce the testimony of Sanborn as first complaint evidence. The defendant objected, arguing that Sanborn was not in fact the first complaint witness because Sara had disclosed the rape to others on at least three prior occasions. In a written order, the judge allowed the Commonwealth's motion. He ruled that Sara's prior disclosures did not meet the test for first complaint evidence because the statement to Sanborn was "the first time she [Sara] disclosed that the defendant had committed sexual offenses against her and participated with . . . Rivera in offenses that he committed as a principal."

The judge's order allowing the Commonwealth's motion to designate Sanborn as the first complaint witness was error for two reasons. First, as our cases recounting the history of the

regarding both statements, he later determined that the second statement was inadmissible.

first complaint doctrine confirm, its essential feature is the report of the sexual assault, not the identity of the perpetrator. As we discussed in King, 445 Mass. at 228-229, the original purpose of the "fresh complaint" rule was to combat the traditional, albeit outdated, notion that a true victim of sexual assault should raise a "hue and cry," or report the sexual assault in a timely manner. Although the first complaint doctrine evolved from the fresh complaint rule, the underlying purpose of first complaint evidence is still "to counterbalance or address inaccurate assumptions regarding stereotypes about delayed reporting of a sexual assault or about sexual assault victims in general," rather than affirmative evidence that the alleged sexual assault actually occurred. Id. at 240. See Mass. G. Evid. § 413(a) (2017). "At its core, therefore, the doctrine exists to facilitate credibility determinations where an allegation of sexual assault is at issue." Commonwealth v. Mayotte, 475 Mass. 254, 260 (2016). The fact that Sara identified the defendant as a perpetrator for the first time in the statement to Sanborn did not supplant the three prior disclosures that, in revealing that a rape actually had occurred, met the substantive test for admissibility as first complaint evidence. Commonwealth v. Murungu, 450 Mass. 441, 446 (2008) (disclosure of actual sexual assault necessary to constitute complaint). Thus, the interpretation of the first

complaint rule to require the identification of the defendant as a prerequisite to admissibility was error.

Second, given our interpretation of the first complaint rule to require only the report of the sexual assault, Sanborn was improperly designated as the first complaint witness. Sara's testimony established that Mary was the first person to whom Sara reported the rape, about one month after it occurred. Where a complainant has reported the sexual assault to multiple persons, the designation of the first complaint witness is solely a temporal consideration; it must not be subject to manipulation based on the likely value of the witness's testimony. The Commonwealth may not "pick and choose among various complaint witnesses to locate the one with the most complete memory, the one to whom the complainant related the most details, or the one who is likely to be the most effective witness." Murungu, 450 Mass. at 446. Unless, for some reason, Mary were unavailable as the first complaint witness, she, not Sanborn, should have been designated as such.

In certain limited circumstances, our law permits one witness to be substituted for another to provide first complaint evidence. We address briefly whether Sanborn properly could be designated as the first complaint witness under this rubric. "[W]hen the first person told of the alleged assault is 'unavailable, incompetent, or too young to testify

meaningfully,' the trial judge may admit testimony from a substitute first complaint witness." Commonwealth v. Kebreau, 454 Mass. 287, 292 (2009), quoting King, 445 Mass. at 243-244. Additionally, a judge may substitute the first complaint witness where the victim's disclosure to the "first person does not constitute a complaint," or where the victim makes a complaint to a person who "has an obvious bias or motive to minimize or distort the victim's remarks." Murungu, 450 Mass. at 446. See Mass. G. Evid. § 413(a) & note. Mary was available to testify and there was no evidence that her testimony was biased or that she had motive to "minimize or distort [Sara]'s remarks." Murungu, supra. Because the Commonwealth failed to demonstrate the propriety of a substitution on either ground, Sanborn's testimony as the first complaint witness could not be admitted on this basis.

The defendant objected to the erroneous admission of Sanborn's first complaint testimony. Therefore, we must determine whether the error was prejudicial. See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). We conclude that it was. Here, the defendant was indicted on three counts of aggravated rape: one as a principal, and two as an aider and abettor. Mary's testimony[6] would have established only that the

_____

[6] Prior to trial, Sanborn interviewed Mary by telephone. During the interview, Mary explained the circumstances and

defendant was present while Rivera raped Sara.  Thus, if Mary, the proper first complaint witness, had testified, the only evidence of the defendant's participation in the rape would have come from Sara's testimony.  The substance of Sanborn's first complaint testimony implicating the defendant in the rape, taken together with her status as a police officer, likely tipped the scales unfairly in favor of Sara's credibility.  See King, 445 Mass. at 243.  Because the Commonwealth cannot show that the error "did not influence the jury, or had but very slight effect," the defendant is entitled to a new trial.  Flebotte, supra.

2.  Admission of the complainant's multiple disclosures. On Sara's direct examination, the judge allowed her testimony that she made four separate disclosures of the rape:  (1) to Mary a few weeks after the rape; (2) to her sister and friends during the sleepover in December, 2012; (3) to her mother shortly after the sleepover; and (4) to Sanborn in January, 2013.  In overruling the defendant's objection to this testimony, the judge explained that the evidence was admissible because "the Commonwealth is entitled to elicit why [Sara] waited to make the disclosure regarding this particular defendant, and why she came forward when she did."  Although the

---

details of Sara's first disclosure of the rape.  A transcript of that interview was included in the record on appeal.

judge noted his concern about "any piling on," he determined that the risk of prejudice was not as high for the defendant because Sara's prior disclosures did not actually implicate the defendant.[7]  The admission of multiple disclosures in the circumstances of this case was error.

The judge's reliance on King, 445 Mass. at 245, for the proposition that a complainant may testify to multiple disclosures of the alleged sexual assault to give temporal context to the first complaint was misplaced.  King states that "the complainant may . . . testify to the details of the first complaint . . . and also why the complaint was made at that particular time."  Id.  This was not, however, an invitation to allow a complainant to testify on direct examination to multiple disclosures in her explanation of why the first complaint was made at a "particular time."  See id. at 243.

We acknowledge that Sara's testimony that she made multiple disclosures may not have had the same impact as multiple witnesses testifying to Sara's report of the sexual assault.  Nonetheless, the admission of her testimony created the same risk of prejudice that we sought to prevent by the limitations

---

[7] Although the judge was under the misapprehension that Mary would testify as a defense witness, the decision to allow Sara to preemptively testify about her disclosure to Mary was error because Sanborn was the designated first complaint witness.  See Commonwealth v. King, 445 Mass. 217, 242-243 (2005), cert. denied, 546 U.S. 1216 (2006).

we imposed in King. Sara's testimony, like that of multiple first complaint witnesses, "likely serve[d] no additional corroborative purpose, and may [have] unfairly enhance[d] [her] credibility." Id. Because this testimony was merely corroborative, it created the very type of prejudice that we cautioned against in King. The first complaint doctrine's limitation to one witness was intended to vitiate the possibility of undue prejudice to the defendant because it eliminated "prejudicial 'piling on' of such witnesses." Id. at 245.

Defense counsel's use of the prior disclosures to attack Sara's credibility did not cure the prejudice to the defendant. Sara's testimony regarding her prior disclosures was admitted substantively, without an instruction limiting the evidence to impeachment purposes. See G. L. c. 233, § 23. This evidence was particularly prejudicial to the defendant in light of the improperly substituted first complaint witness's testimony, which was the only evidence corroborating the defendant's participation in the rape. Moreover, the judge compounded the error by allowing Sara to explain, during each of the disclosures, why she did not previously implicate the defendant. See King, supra.

We have recognized that the first complaint doctrine does not "prohibit the admissibility of evidence that, while barred

by that doctrine, is otherwise independently admissible."
Commonwealth v. Arana, 453 Mass. 214, 220-221 (2009). The
Commonwealth, relying on Arana, argues for the first time on
appeal that the evidence of Sara's multiple complaints was
independently admissible as prior inconsistent statements, see
Mass. G. Evid. § 613(a)(1) & note (2017), and that, in any
event, no prejudice resulted because of defense counsel's use of
the statements on cross-examination. We disagree.

Sara's statements were not admissible as prior inconsistent
statements because the Commonwealth did not offer them as such.
See id. The judge admitted the evidence of Sara's prior
disclosures to allow the Commonwealth to explain why Sara waited
to make the disclosure about the defendant's participation in
the rape and why she came forward when she did. Moreover, the
Commonwealth did not attempt to prove that Sara made prior
statements that were inconsistent with her present testimony,
nor did it "lay a foundation by asking [Sara] if the prior
statements were in fact made and . . . giv[e] [Sara] an
opportunity to explain," as required. Mass. G. Evid.
§ 613(a)(1). See G. L. c. 233, § 23. Sara's testimony to the
multiple disclosures, therefore, was not independently
admissible.

3. Battered woman syndrome evidence. In support of her
duress defense, the defendant sought to introduce expert witness

testimony regarding her battered woman syndrome diagnosis. The judge excluded the defendant's expert witness testimony on the ground that the defendant failed to lay a proper foundation for such evidence. The judge determined that such testimony was "irrelevant, and hence inadmissible, absent competent evidence before the jury to support the putative expert testimony. The expert's recitation of what the defendant told her is inadequate in that regard, as it may only be considered by the jury with respect to the validity of the doctor's proffered opinion."[8] This was error.

As discussed infra, G. L. c. 233, § 23F, provides the defendant the statutory right to present such evidence. Nothing in § 23F requires that a defendant proffer evidence of abuse in order to present expert witness testimony, where certain specified defenses are asserted.[9] Moreover, the judge's reliance on Mass. G. Evid. § 703 (2017) to exclude the defendant's expert

---

[8] The judge stated that "there has to be some quantum of admissible competent evidence of some history of psychological or physical abuse, that could support the opinion that [the defendant's expert witness] would be offering." The judge noted that he was not setting an "overly high threshold," but insisted that there must be some admissible evidence, such as a witness who could testify to the abuse, to establish a foundation to support the defendant's proposed expert witness testimony.

[9] General Laws c. 233, § 23F, permits the defendant to introduce "either or both" evidence that she was a victim of abuse or expert evidence regarding battered woman syndrome; therefore, it was error for the judge to require the defendant to establish evidence of abuse as a predicate to introducing expert witness testimony. See G. L. c. 233, § 23F.

witness testimony was misplaced where § 23F provides an independent statutory basis to admit such evidence.

Because G. L. c. 233, § 23F, is not so narrowly construed, we take this opportunity to provide guidance regarding the statutory requirements to admit evidence under G. L. c. 233, § 23F.

General Laws c. 233, § 23F, states:

"In the trial of criminal cases charging the use of force against another where the issue of defense of self or another, defense of duress or coercion, or accidental harm is asserted, a defendant shall be permitted to introduce either or both of the following in establishing the reasonableness of the defendant's apprehension that death or serious bodily injury was imminent, the reasonableness of the defendant's belief that [s]he had availed [her]self of all available means to avoid physical combat or the reasonableness of a defendant's perception of the amount of force necessary to dealt with the perceived threat:

"(a) evidence that the defendant is or has been the victim of acts of physical, sexual or psychological harm or abuse;

"(b) evidence by expert testimony regarding the common pattern in abusive relationships; the nature and effects of physical, sexual or psychological abuse and typical responses thereto, including how those effects relate to the perception of the imminent nature of the threat of death or serious bodily harm; the relevant facts and circumstances which form the basis for such opinion; and evidence whether the defendant displayed characteristics common to victims of abuse.

"Nothing in this section shall be interpreted to preclude the introduction of evidence or expert testimony as described in clause (a) or (b) in any civil or criminal action where such evidence or expert testimony is otherwise now admissible."

The Commonwealth contends that § 23F requires foundation testimony or evidence supporting an instruction on one of the defenses specified in order to trigger the application of § 23F. We do not agree.  In order to present evidence under § 23F, a defendant need not present affirmative evidence of abuse because § 23F provides that, where a defendant asserts the defense of self-defense or defense of another, duress or coercion, or accidental harm, the "defendant shall be permitted to introduce" certain evidence to establish the reasonableness of his or her apprehension that death or serious bodily harm was imminent (emphasis supplied).  G. L. c. 233, § 23F.

Section 23F is more permissive than the common-law bases for expert opinions outlined in Mass. G. Evid. § 703.  Compare G. L. c. 233, § 23F, with Mass. G. Evid. § 703 (facts or data on which expert witness may base opinion include "[a] facts observed by the witness or otherwise in the witness's direct personal knowledge; [b] evidence already in the record or that will be presented during the course of the proceedings . . . ; and [c] facts or data not in evidence if the facts or data are independently admissible in evidence and are a permissible basis for an expert to consider in formulating an opinion").  Section 23F does not restrict expert witness testimony to facts in evidence, require the witness's personal knowledge or observation, or require that the basis for the expert's opinion

be independently admissible.  Instead, the statute merely requires that the defendant assert certain specified defenses to render admissible evidence of the defendant's past or current abuse and expert witness testimony regarding abusive relationships and the impact such abuse had on the defendant. See G. L. c. 233, § 23F.

Additionally, the Commonwealth's contention that § 23F applies only to criminal cases "charging the use of force against another," id., is without merit.  The Commonwealth reads § 23F too narrowly.  Although the statute provides that a criminal defendant in cases "charging the use of force against another . . . shall be permitted to introduce" certain evidence, it does not require that the use of force is an essential element of the crime in order for § 23F to apply.  Id.  See Commonwealth v. Anestal, 463 Mass. 655, 675-676 (2012) (applying § 23F in murder in first degree case, notwithstanding fact that "force" is not essential element of crime of homicide).

On retrial, where the defendant asserts the defense of duress, expert witness testimony regarding the defendant's past abuse and battered woman syndrome diagnosis, and the impact thereof, shall be admissible, pursuant to § 23F, with proper notice.  See Mass. R. Crim. P. 14 (b) (2) (A), as appearing in 463 Mass. 1501 (2012).

Conclusion.  For the reasons set forth above, the defendant's convictions of aggravated rape of a child are reversed and the verdicts are set aside.  The case is remanded to the Superior Court.

So ordered.